## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **MARY BLEICK**, individually, and on behalf of all others similarly situated, ℅ DannLaw, 15000 Madison Avenue Lakewood, OH 44107 | Case No. |
| | Judge |
| -and- | Magistrate Judge |
| **TODD BUTLER**, individually, and on behalf of all others similarly situated, ℅ DannLaw, 15000 Madison Avenue Lakewood, OH 44107 | **VERIFIED CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND OTHER RELIEF** |

-and-

**ALLEN SKIERSKI**, individually, and on behalf of all others similarly situated, ℅ DannLaw, 15000 Madison Avenue Lakewood, OH 44107

-and-

**GARY PETRIME**, individually, and on behalf of all others similarly situated, ℅ DannLaw, 15000 Madison Avenue Lakewood, OH 44107

Plaintiffs,

v.

**SHERYL MAXFIELD**, *in her official capacity as Director of Commerce* ℅ Department of Commerce 77 S. High Street, 22nd Floor Columbus, OH 43215-6108

-and-

**AKIL HARDY,** *in his official capacity as*
*Superintendent of the Division of Unclaimed*
*Funds*
℅ Department of Commerce
77 S. High Street, 20th Floor
Columbus, OH 43215-6108

     -and-

**ROBERT SPRAGUE,** *in his official*
*capacity as Treasurer of the State of Ohio*
30 E. Broad Street, 9th Floor
Columbus, Ohio 43215

     -and-

**JOY BLEDSOE,** *in her official capacity as*
*Executive Director of the Ohio Facilities*
*Construction Commission*
30 W Spring St, 4th Floor
Columbus, OH 43215

***Also serve:***
Ohio Attorney General
30 E. Broad St., 14th Floor
Columbus, OH 43215

          Defendants.

Plaintiffs Mary Bleick, Todd Butler, Allen Skierski, and Gary Petrime (collectively referred to hereinafter as "Plaintiffs"), individually, as representatives of a class of persons with funds held in trust by the State of Ohio in the state's unclaimed funds trust fund, hereby bring these claims against Defendants Sheryl Maxfield, in her official capacity as the Director of Commerce, Akil Hardy, in his official capacity as the Superintendent of the Division of Unclaimed Funds, Robert Sprague, in his official capacity as Treasurer of the State of Ohio, and Joy Bledsoe, in her official capacity as Executive Director of the Ohio Facilities Construction Commission (collectively "Defendants") and allege upon their personal knowledge and upon

information and belief, based on the investigation of counsel and facts that are matters publicly known as follows:

1.    Plaintiffs commence this case to prevent the unconstitutional and unlawful taking of private property held by the State of Ohio as a custodian for individual property owners.

2.    Specifically, Defendants intend to confiscate and divert Ohioans' "unclaimed funds" from their intended purpose—to be held and preserved for the benefit of the rightful owners—to finance the construction of a private sports stadium for the Cleveland Browns.

3.    Plaintiffs are residents of the state of Ohio and bring this action in their individual capacities, on behalf of a putative class of persons affected by the conduct as alleged herein, and seek prospective relief against ongoing and imminent constitutional violations by state officials in their official capacities under Ex parte Young, 209 U.S. 123 (1908).

4.    Plaintiffs seek prospective declaratory and injunctive relief under the U.S. Constitution and 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

5.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the U.S. Constitution and 42 U.S.C. § 1983. Jurisdiction also lies under 28 U.S.C. § 1343(a)(3)–(4) (civil rights) and 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act).

6.    The Court has supplemental jurisdiction over any state-law claims under 28 U.S.C. § 1367(a). Plaintiffs do not seek relief requiring this Court to order state officials to comply with state law and reserve the right to pursue such relief in Ohio courts if necessary.

7.    Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(1)–(2) because a substantial part of the events or omissions giving rise to the claims have occurred in

this District or will occur here, where the Defendants are located, and where the challenged transfers, certifications, and expenditures are administered.

## INTRODUCTION AND BACKGROUND
### Ohio Changes Its Unclaimed Funds Act to Take Private Property

8.     Plaintiffs and the class described below are rightful owners of property currently held in trust by the State of Ohio pursuant to Ohio Revised Code Chapter 169 in an account otherwise known as the "Unclaimed Funds Trust Fund" ("UFTF").

9.     Money held in the UFTF by the State of Ohio, pursuant to the statute, is private property held in trust by the State until the rightful owner claims their property.

10.     In fact, the Division of Unclaimed Funds maintains a database of properties held by the State.

11.     The Division of Unclaimed Funds also maintains a separate website where persons with properties in the UFTF may be able to search for property belonging to them.

12.     However, not all persons in the Division's database are necessarily findable on the website and, as a result, certain persons may not ever have a real opportunity to locate their properties or even know that properties are available to be recovered since the State does not provide any direct notice to property owners.

13.     Each Plaintiff has confirmed, via a review of the website maintained by the Ohio Division of Unclaimed Funds, that the State is currently holding unclaimed property to which they are entitled, either as original owners or heirs of the original owners. They are entitled to recovery of these properties and thus possess a vested interest in the subject matter of this action.

14.     None of the Plaintiffs ever received notice from Defendants regarding properties held by the State, the State's planned taking of their properties nor have they been provided a meaningful opportunity to object to the proposed taking of their properties.

4

15. Ohio's unclaimed funds statute, codified at R.C. 169.01, *et seq*., requires that financial institutions and other holders of personal property turn the property over to the State of Ohio after the statutorily required period set forth in R.C. 169.02.

16. The primary purpose of requiring property holders to turn it over to the UFTF is to enable property owners the ability to become reunited with their respective properties.

17. Despite the ability to reunite property owners with their funds in the UFTF, the State of Ohio is currently holding over $4 billion in other people's property, a dismal statistic if the purpose of the UFTF is truly to reunite property owners with their property.

18. For example, funds found in safe deposit boxes, unreturned deposits for utility services, dormant bank accounts, insurance proceeds, or even mineral dividends, must each be turned over to the State of Ohio after a set period of time, to be held in trust for the rightful owners.

19. Under the statute in force prior to June 30, 2025, Ohioans had no restrictions on their ability to seek recovery of their personal property held in the UFTF.

20. However, the State now intends to confiscate the private property held in the UFTF for the purpose of funding a private development, depriving the rightful owners of their property and violating Constitutional principles in the process.

21. The State intends to do so even though it has been long settled that funds held by the State of Ohio in its "Unclaimed Funds" account are private property.

22. The UFTF is not property of the State of Ohio to use as it deems fit.

23. Moreover, the revised statute fails to provide any individualized notice to property owners before a taking nor does it contain any meaningful due process safeguards.

24. Moreover, unclaimed funds are not properly described as "operating revenue" or a component of the State's "general fund" to be appropriated as part of the State's budget.

25. As the Ohio Supreme Court stated in 2009, the funds in the UFTF "are not abandoned; they are the property of their owner." See Sogg v. Zurz, 121 Ohio St. 3d 449, 16 (2009) (holding that the state cannot take interest earned on private property).

26. Nevertheless, the Ohio 136th General Assembly recently passed House Bill 96 ("HB 96"), the state's biennium budget legislation, which included amendments to Chapter 169 of the Ohio Revised Code directing the State to confiscate and assume ownership of individual Ohioans' unclaimed property for the first time.

27. Governor DeWine signed HB 96 on or about June 30, 2025 thereby codifying these amendments in Chapter 169.

28. As signed by the Governor, HB 96 requires the confiscation of funds in the UFTF beginning on January 1, 2026 and on a continuing basis going forward.

29. As signed into law by the Governor, a significant portion of funds in the UFTF will automatically "escheat to the State" on January 1, 2026, including property belonging to Plaintiffs and members of the class. See Amendment to R.C. 169.08(I)(1) set forth in HB 96, p. 406.[1]

30. Ohioans must now "race the clock" in an attempt to recover their property or the property they are entitled to as heirs of the original property owner, fundamentally altering the property rights of Ohioans and others with claims to property in the UFTF and without any individualized notice that they may have property held in the UFTF before it is taken by the State.

---

[1] HB 96 may be viewed on the State's website in its entirety here:
https://www.legislature.ohio.gov/legislation/136/hb96/documents (last visited September 30, 2025).

31.     In fact, many remain unaware that their property rights are set to be cut off because Defendants have made little to no effort to reunite unclaimed property to its rightful owners and the amendments to Chapter 169 set forth in HB 96 do not require any notice to individuals who are about to lose their property rights.

32.     Therefore, HB 96, as signed by Governor DeWine, authorized the taking of Ohioans' private property for private development purposes in violation of, *inter alia*, the Fifth and Fourteenth Amendments of the U.S. Constitution, Article I, Section 19 of the Ohio Constitution, and the statutory fiduciary duty imposed by Ohio Revised Code Chapter 169 to preserve the funds for the actual owners of this private property.

### The State is Taking and Liquidating Individuals' Property For The Benefit of a Private Enterprise

33.     The "Cleveland Browns" organization is a professional football team which participates in the National Football League.

34.     Both the Cleveland Browns and the National Football League are privately held, for-profit businesses.

35.     Except for the period between 1996-1998, the Cleveland Browns football team has played its home games on Cleveland's lakefront.

36.     Between 1946 and 1995, the Cleveland Browns played their home games in the former Cleveland Municipal Stadium, a publicly owned facility originally constructed in 1931.

37.     Between 1996 and 1998, the Cleveland Browns were defunct after the widely despised owner, Art Modell, relocated the team to Baltimore, MD following the 1995 season.

38.     The resulting public outcry over Art Modell's decision resulted in a series of lawsuits and negotiations ultimately culminating in a settlement involving the City of Cleveland, the Browns' then owner, Art Modell, and the National Football League.  See, e.g. Beder v.

7

Cleveland Browns, 129 Ohio App. 3d 188 (8th Dist. 1999) (providing background of the Cleveland Browns' move); City of Cleveland v. Cleveland Browns, Inc., et al. Cuyahoga County Common Pleas Case No. CV-95-297833 (the city's challenge to the move; settled and dismissed 8/16/1996).

39.     Pursuant to the parties' agreement, the NFL committed to replace the Cleveland Browns with a new football team beginning in 1999 if the City constructed an entirely new facility for the team in time to start the 1999 season.[2]

40.     Among the chief concerns in choosing to rebuild the football stadium on the existing site were the compressed timeline, the ability to leverage the preexisting infrastructure to expedite the completion of the new facility, and the historical significance of this franchise's location on Ohio's "North Coast."

41.     The City built the new stadium, originally named "Cleveland Browns Stadium" signifying the team's identity and connection to the City, by utilizing public funding—over $290 million in taxpayer dollars, including revenue from a "sin tax" approved by Cuyahoga County voters, along with financing provided by the National Football League.

42.     Since the new stadium's completion in 1999, the Cleveland Browns have played their home games at this publicly owned facility.

43.     The construction of this new public facility allowed for the continuation of the long legacy of professional football on Cleveland's lakefront that dates back to the 1930's, when the Cleveland Rams—a franchise which later relocated to Los Angeles—played their home games in Cleveland Municipal Stadium.

---

[2] https://www.nytimes.com/1996/02/12/sports/pro-football-how-compromise-built-cleveland-a-new-stadium.html  "How Compromise Built Cleveland a New Stadium." (Last visited September 30, 2025).

44.  Including both the Rams and the Browns, professional football has played home games on the city's historic lakefront site in a publicly owned and operated facility for nearly a century.

45.  On or about March 18, 2025, the current owner of the Cleveland Browns franchise announced plans to abandon the Cleveland Browns' long legacy of playing home games in the City and pursue the construction of a new, but privately owned facility outside of Cleveland at a cost projected to exceed $2 billion.[3]

46.  Upon information and belief, the Cleveland Browns organization is controlled by Haslam Sports Group, LLC which is owned and operated by multi-billionaire Jimmy Haslam and his wife Dee Haslam.

47.  According to Forbes magazine, Jimmy Haslam is one of the wealthiest individuals in the world and, if his home were in Ohio, he would be the wealthiest person in Ohio.[4]

48.  The proposed new stadium is a private venture and, upon information and belief, fully controlled by Haslam and/or the Haslam Sports Group. The public would not have any ownership or other rights in this private venture.

49.  Nevertheless, the Haslam Sports Group and Haslam have sought *public* funding for their thoroughly *private* venture to cover approximately half the cost of the facility's construction, and while the Haslam Sports Group claim that monies provided could be returned,

---

[3] https://www.news5cleveland.com/sports/browns/city-of-cleveland-calls-press-conference-for-update-on-the-status-of-stadium-negotiations "Browns leaving Downtown Cleveland for Brook Park." (Last visited September 30, 2025).

[4] https://www.beaconjournal.com/story/news/2025/04/04/2025-forbes-billionaires-list-ohio-natives-lebron-james-vivek-ramaswamy-haslam/82874307007/ "Akron native LeBron James, Vivek Ramaswamy, more Ohioans make Forbes billionaires list" (last visited September 30, 2025). Since Mr. Haslam's personal residence is in Tennessee, he is not included on the list of wealthiest Ohioans but if he were, he'd surpass Ohio's current No. 1, Les Wexner, the founder of Limited Brands.

at least two state agencies have concluded that the economic forecasts provided by the developers are wildly optimistic and the community benefits touted are unlikely to materialize.[5]

50.     In fact, beyond speculative economic benefit to the government and community, there is no public purpose for the proposed project and any claimed economic benefits are a mere pretext used as an attempt to justify public funding for a thoroughly private project.  As the nonpartisan Legislative Service Commission, which serves the Ohio General Assembly wrote in a memorandum to state legislators:

> "*The academic literature on publicly funded sports stadiums is vast, covering many decades, sports, states and municipalities…The overwhelming conclusion from this body of research is that there are little to no tangible impacts of sports teams and facilities on local economic activity. A second conclusion is that the level of government subsidies given for the construction of facilities far exceeds any observed economic benefits when they do exist.*" .

See "Browns Stadium Funding" Memorandum dated April 25, 2025 attached hereto as **Exhibit A**.

51.     Given the absence of a legitimate public purpose for this private venture, it is fair to ask why the state legislature would authorize the liquidation of private property belonging to individual Ohioans to fund a privately owned stadium—particularly in a manner that infringes upon the constitutional rights of Ohioans. The answer appears rooted not in sound public policy or constitutional principle, but in political expediency and the influence of wealthy political donors.

52.     Public records and reporting indicate that Jimmy and Dee Haslam were among the largest contributors to the campaign opposing "Issue 1" in November 2024. [6]

---

[5] https://www.news5cleveland.com/sports/browns/state-agencies-flag-browns-stadium-plans-browns-say-analysis-contains-misinformation#:~:text=In%20the%20memo%2C%20the%20researchers,broadcast%2C%20rewritten%2C%20or%20redistributed.  "State agencies flag Browns' stadium plans." (Last visited September 30, 2025).
[6] https://www.wkyc.com/article/news/politics/elections/cleveland-browns-owners-jimmy-dee-haslam-largest-donors-campaign-defeat-ohio-redistricting-amendment/95-d6bb895d-fde6-42f5-9435-

53.     These donations, made concurrent with the Haslam Sports Group's pursuit of public funding for their stadium project, raise legitimate concerns about the potential influence of such contributions on legislative decision-making and the support sought to help pay for the Haslams' $2 billion boondoggle.[7]

54.     The Haslams' support was crucial to the failure of Issue 1, which represented a win for the Ohio House Speaker who opposed Issue 1 because, if it had passed, it would have dealt a blow to the Speaker's ability to gerrymander legislative districts and threatened his party's ability to retain supermajority in the statehouse. It appears that the Speaker's support for public funding for the Haslams' private project is the reward for the Haslams' direct support on defeating Issue 1.

55.     What makes the State's stadium funding proposal particularly disturbing is not just its abandonment of a historic public asset, the severing of the team's long-standing connection to the City, or the unmistakable appearance of "pay to play" political favoritism that taints its origins—but the deeply inappropriate decision to finance a private development project by raiding a trust fund meant to safeguard the private property of unsuspecting Ohioans.

56.     The State decided to pay for this private development by confiscating and liquidating funds in Ohio's UFTF— property that legally belongs to individual Ohio residents — to finance this new, privately owned stadium project at the expense of those who have funds waiting to be claimed and which are supposed to be held in trust.

---

b02aa4e25338 "Jimmy and Dee Haslam among largest donors in campaign to defeat Ohio redistricting amendment" (last visited September 30, 2025).

[7] Merriam Webster defines the term "boondoggle" as "a wasteful or impractical project or activity often involving graft." https://www.merriam-webster.com/dictionary/boondoggle (last visited September 30, 2025)

57. The state's plan involves taking private property for the purpose of benefiting a private business and, in particular, one person (Jimmy Haslam) who is more than financially capable of funding the construction of his own privately operated football stadium, as other multi-billionaire franchise owners have done (albeit a minority).[8]

58. Even the Ohio Attorney General urged the Governor to veto this drastic change given that it fundamentally alters Ohioans' rights to "**their** monies" and is likely to cause many to "lose out due to this change." See Letter from the Ohio Attorney General to Governor DeWine dated June 27, 2025, attached hereto as **Exhibit B**.

59. The Ohio Attorney General acknowledged that "the statutory taking of public funds without a clear public benefit is poor policy." Id.

60. Poor policy indeed—it represents an unconstitutional taking and violates Ohio's longstanding acknowledgment that "Ohio has always considered the right of property to be a fundamental right." See City of Norwood v. Horney, 110 Ohio St.3d 353, ¶38 (2006).

61. Plaintiffs are residents of the State of Ohio, and each has verified that they have unclaimed funds held in the UFTF, which are listed on the Ohio Division of Unclaimed Funds' website and now subject to escheatment.

62. Defendant, Sheryl Maxfield is the State of Ohio's Director of Commerce, which oversees the Division of Unclaimed Funds, the governmental office responsible for reuniting Ohioans with their property.

63. According to HB 96, the "director of commerce" must certify funds from the UFTF and redirect these funds to the State Treasurer to ensure that they are available for the construction of the private venture. See HB 96, p. 406.

---

[8] https://theweek.com/sports/taxpayer-subsidized-stadiums?utm_source=chatgpt.com
"The economics of taxpayer-subsidized stadiums" (last visited September 30, 2025).

64. R.C. 169.01(K) also authorizes Defendant Akil Hardy, as the "superintendent of unclaimed funds" to redirect these unclaimed funds to the State Treasury.

65. Defendant, Robert Sprague, acting in his capacity as Treasurer for the State of Ohio, is charged with the responsibility of maintaining, supervising, securing, and accounting of funds held by the State of Ohio, including Ohio's unclaimed funds.

66. Defendant, Joy Bledsoe, acting in her capacity as the Executive Director of the Ohio Facilities Construction Commission is charged with the responsibility of utilizing the confiscated funds from the UFTF for the newly created "Cultural, Sports, and Major Sports Facilities Grant Fund" and expending at least $600,000,000 of the funds generated from the taking of Ohioans' private property to help pay for the Cleveland Browns' stadium project.

67. The State's plan to confiscate Ohioans' private property includes a directive that Defendant Sprague confiscate the unclaimed funds certified by the "director of commerce" and divert them into a separate fund to be utilized to finance the construction of a private sports facility.

68. Defendants are acting under the color of law to exercise this taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the Ohio Constitution.

69. On or about January 1, 2026, Defendants are statutorily obligated to confiscate and redirect at least $1 billion from the UFTF to the newly created "Ohio Cultural and Sports Facility Performance Grant Fund" which will be administered by Defendant Bledsoe. This imminent action, required by law already enacted, places Plaintiffs and the putative class at immediate risk of losing their property and constitutional rights.

13

70.     Each Defendant has a specific connection to enforcement of the challenged provisions: the Director of Commerce (Maxfield) certifies and directs transfers from the UFTF; the Superintendent of Unclaimed Funds (Hardy) administers the UFTF and effects transfers; the State Treasurer (Sprague) receives and manages the transferred monies; and the Executive Director of the Ohio Facilities Construction Commission (Bledsoe) administers and expends the diverted funds through the stadium grant program. Prospective relief against these officials in their official capacities is proper under Ex parte Young, 209 U.S. 123 (1908).

71.     In light of HB 96, Plaintiffs and similarly situated individuals are now placed in the untenable position of having to race against a statutory deadline, without adequate notice or legal clarity, in order to prevent forfeiture of their property.

72.     The State has not provided direct notice to property owners, and the sudden reclassification of custodial property as state property subjects Plaintiffs to an imminent risk of loss without due process and other constitutional protections.

73.     Each Plaintiff has a live, concrete stake: Ohio's public website reflects a positive balance currently held in the UFTF for each named Plaintiff; the challenged provisions direct imminent diversion or extinguishment of those interests on or about January 1, 2026; and the requested declaratory and injunctive relief will redress that harm by preventing diversion and preserving Plaintiffs' ability to reclaim their property.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

75.     The proposed class is defined as:

> **"All individuals and entities whose funds are being held in the Ohio Unclaimed Funds Trust Fund on or after June 30, 2025**."

14

76.     Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

77.     Plaintiffs reserve the right to amend the above definitions or to propose subclasses in subsequent pleadings and motions for class certification.

78.     <u>Numerosity</u>: The class is so numerous that joinder of all members is impracticable, if not impossible. Upon information and belief, the class includes tens or hundreds of thousands of individuals with unclaimed funds in the custody of the State of Ohio.

79.     <u>Commonality</u>: There are questions of law and fact common to the class, including but not limited to:

 a.  Whether the State of Ohio and its officers have a fiduciary duty to preserve unclaimed private property for the rightful owners;

 b.  Whether confiscating an individual's property without a public purpose constitutes an unconstitutional taking;

 c.  Whether confiscating private property to fund a private stadium project constitutes an unconstitutional taking;

 d.  Whether confiscating private property in the absence of a state emergency without compensating the owner first violates Article I, section 19 of Ohio's Constitution;

    e.   Whether the proposed confiscation of private property violates due process rights;

    f.   Whether such confiscation violates the purpose of ORC Chapter 169.

80.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the class. Plaintiffs and class members all have a current or potential claim to unclaimed funds held in trust, and all are subject to the same risk of diversion of their property without notice or compensation.

81.    <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have no interests antagonistic to the class and are represented by competent counsel experienced in complex litigation, constitutional claims, and class actions.

82.    Plaintiffs are not subject to any individual defenses unique from those conceivably applicable to other Class Members or the class in its entirety. Plaintiffs anticipate no management difficulties in this litigation.

83.    <u>Superiority of Class Action</u>: Since the damages suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation by each member make or may make it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein. Should separate actions be brought or be required to be brought by each individual member of the Class, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants.

84.    The prosecution of separate actions would also create a risk of inconsistent rulings, which might be dispositive of the interests of the Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests adequately.

16

85.     Defendants have acted or refused to act on grounds that are generally applicable to the class, making final injunctive and declaratory relief appropriate respecting the class as a whole under Fed. R. Civ. P. 23(b)(2). Class certification will ensure uniform and equitable adjudication of the legal and constitutional rights of all unclaimed-fund beneficiaries.

86.     The State of Ohio currently holds approximately $4.7 Billion in unclaimed funds, property of Ohioans, pursuant to R.C. 169.01, *et seq*.

87.     Each of the named Plaintiffs are owners of property currently held in the custody of the Division of Unclaimed Funds.

88.     Moreover, upon information and belief, Plaintiffs are entitled to a claim on property held in the UFTF as an heir of the original property owner.

89.     Until June 30, 2025, Ohio held these funds strictly in a fiduciary capacity for the exclusive benefit of its rightful owners.

90.     However, on June 30, 2025, Governor DeWine signed HB 96 into law, thereby altering Plaintiffs' relationship with their unclaimed property thereby imminently threatening the taking of their private property.

91.     The funds in the UFTF are not surplus and must remain available to pay verified claims by owners or their heirs, including Plaintiffs'.

92.     Unless enjoined, Defendants will immediately effectuate this planned confiscation pursuant to newly imposed statutory obligations. These steps include certification of fund balances, movement of funds, and preparation for disbursement, thereby endangering the solvency of the UFTF and placing private property at immediate risk of dissipation.

**COUNT I**
**TAKINGS CLAUSE**
**(U.S. CONST. amend. V, XIV; 42 U.S.C. § 1983)**
**(On behalf of Plaintiffs and the Class)**

93.     Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

94.     Plaintiffs have vested property interests in unclaimed funds held by the State and administered by Defendants.

95.     Defendants intend to reallocate those funds for private use without just compensation or due process.

96.     This constitutes a violation of the Takings Clause set forth in the United States Constitution, as amended by the Fifth Amendment in the Bill of Rights.

97.     The Fifth Amendment says in pertinent part that: "No person shall be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

98.     Defendants intend to take the described actions, under color of state law, without affording Plaintiffs and the Class due process and without paying just compensation prior to the taking, thereby violating the United States Constitution.

99.     Defendants intend to take the described actions, under color of state law, not for a public purpose, but solely to benefit a private enterprise.

100.    As a result, Plaintiffs are entitled to declaratory and injunctive relief and attorneys' fees under 42 U.S.C. § 1988.

**COUNT II**
**DUE PROCESS CLAUSE**
**(U.S. CONST. amend. XIV; 42 U.S.C. § 1983)**
**(On behalf of Plaintiffs and the Class)**

101.    Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

102.    There is no provision in H.B. 96 to provide Plaintiffs any direct notice or opportunity to object to the confiscation of their property as contemplated by the bill.

103.    The Fifth Amendment to the United States Constitution prohibits, inter alia, deprivation of property rights without due process of law- notice and an opportunity to be heard.

104.    The Fourteenth Amendment to the United States Constitution, applies the restrictions of the Fifth Amendment to the States.

105.    By confiscating the funds of Plaintiffs and others in the putative class without providing for adequate notice and an opportunity to be heard, Defendants' imminent actions violate these Amendments to the U.S. Constitution.

106.    As a result, Plaintiffs are entitled to declaratory and injunctive relief and attorneys' fees under 42 U.S.C. § 1988.

### COUNT III
### VIOLATION OF ARTICLE I, SECTION 19, OHIO CONSTITUTION
### (On behalf of Plaintiffs and the Class)

107.    Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

108.    Plaintiffs assert this claim subject to the Eleventh Amendment and Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984); they seek only declaratory relief to the extent cognizable in federal court and do not request an order compelling state officials to comply with state law, reserving such relief for Ohio courts if necessary.

109.    Similar to the United States Constitution, Ohio's Constitution also protects private property from being taken for private use or without just compensation.

110.    In fact, Ohio's Constitutional protections are stronger than the Federal Constitution.

111.     Article I, Section 19 of the Ohio Constitution states as follows:

Private property shall ever be held inviolate, but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money, and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner.

112.     This constitutional provision states that private property shall be "inviolate," signifying that the protection and preservation of private property is a fundamental principle of Ohio's constitutional order.

113.     This provision also mandates that compensation be paid to the private property owner in one of two situations:  (a) when there is a "public emergency" such as a war or a natural disaster, the Constitutional provision permits a taking but requires compensation at some point, presumably after the emergency ends, (b) in non-emergency situations, the State of Ohio must pay the private property owner *before* the taking occurs.

114.     The proposed taking at issue in this situation is a non-emergency situation.

115.     Defendants intend to seize and divert the private property of Plaintiffs and members of the class without first compensating those to whom this property belongs and without notice.

116.     Moreover, the taking itself appears to violate Ohio's constitution as interpreted by the Ohio Supreme Court in City of Norwood v. Horney, 110 Ohio St. 3d 353 (2006), which stands for the proposition that an individual's property cannot be taken for a non-public purpose.

117.     In the City of Norwood case, the Ohio Supreme Court held that "although economic factors may be considered in determining whether private property may be appropriated, the fact that the appropriation would provide an economic benefit to the

20

government and community, standing alone, does not satisfy the public-use requirement of Section 19, Article I of the Ohio Constitution." <u>Id.</u> at 9.

118. Given the complete absence of a public purpose or any public benefit whatsoever, the proposed taking violates Ohio's Constitution.

119. The State's directive to Defendants to seize private property and to redirect this property violates the Ohio Constitution and entitles Plaintiffs and the class members to declaratory and injunctive relief.

**<u>COUNT IV</u>**
**BREACH OF FIDUCIARY DUTY UNDER R.C. 169.01, *et seq*.**
**(On behalf of Plaintiffs and the Class)**

120. Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

121. Plaintiffs assert this claim subject to the Eleventh Amendment and <u>Pennhurst State School & Hospital v. Halderman</u>, 465 U.S. 89 (1984); they seek only declaratory relief to the extent cognizable in federal court and do not request an order compelling state officials to comply with state law, reserving such relief for Ohio courts if necessary.

122. The State holds unclaimed funds as a trustee and has no right in the monies held in the UFTF.

123. Until the passage of H.B. 96, R.C. §169.05 did not authorize or permit the use of UFTF for private development.

124. Both the alteration of the property rights of Plaintiffs and the members of the class along with the eventual confiscation of these private funds for a private use constitutes a breach of the State's fiduciary duty to Plaintiffs and the Class.

## COUNT V
## VIOLATION OF THE OHIO CONSTITUTION – SINGLE SUBJECT RULE
### (Ohio Const., Art. II, § 15(D))
### (On behalf of Plaintiffs and the Class)

125.    Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

126.    Plaintiffs assert this claim subject to the Eleventh Amendment and Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984); they seek only declaratory relief to the extent cognizable in federal court and do not request an order compelling state officials to comply with state law, reserving such relief for Ohio courts if necessary.

127.    Article II, Section 15(D) of the Ohio Constitution provides that: "No bill shall contain more than one subject, which shall be clearly expressed in its title."

128.    The purpose of this provision in the State Constitution is to place "concrete limits on the power of the General Assembly to proceed however it saw fit in the enactment of legislation." State ex rel. Ohio Acad. of Trial Lawyers v. Sheward 86 Ohio St. 3d 451, 495 (1999).

129.    The State's budget bill is an appropriation of the State's general revenue funds.

130.    The UFTF is established under R.C. Chapter 169 and is unrelated in subject matter or legal purpose to capital expenditures on private stadium development.

131.    The inclusion of stadium financing language in a general operating or biennial budget bill violates the single subject rule because:

      a.  The provision authorizing the confiscation and diversion of custodial unclaimed funds to subsidize a private stadium project bears no rational relationship to the general subject of the State's operating budget. It constitutes a distinct and controversial public policy initiative that was improperly inserted into a must-pass appropriations bill, thereby obscuring the issue from meaningful public scrutiny and legislative deliberation;

b. The amendment seeks to use the budget process as a procedural shield for an otherwise unconstitutional taking of private property, frustrating transparency and denying affected citizens fair notice of their rights being extinguished;

c. The title of H.B. 96 fails to disclose any reference to the seizure or redirection of unclaimed funds for private real estate development, thereby violating the requirement that legislation give fair notice of its subject matter;

d. The inclusion of this stadium funding mechanism in HB 96 jeopardizes the fiscal integrity of the Unclaimed Funds Trust Fund—an account in which Plaintiffs and members of the putative class hold legal property interests—without any factual findings or legislative record supporting the impact on solvency or risk to the trust corpus; and

e. Amendments to R.C. §169.01, et seq. were inserted into H.B. 96 during the final days of legislative proceedings, without public debate, committee hearings, or any meaningful opportunity for review by either legislators or the general public.

132. Because the amendment to R.C. 169.08 offends the single-subject rule, the amendment is unconstitutional and void.

## COUNT VI
### DECLARATORY JUDGMENT (28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 57)
### (On behalf of Plaintiffs and the Class)

133. Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

134. An actual, substantial, and immediate controversy exists between the parties regarding the constitutionality of Defendants' implementation and enforcement of HB 96's provisions that divert, transfer, or expend monies from the UFTF for stadium funding or other non-custodial purposes.

135. Under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, Plaintiffs seek a declaration that enforcing or implementing those provisions violates the Fifth and Fourteenth Amendments

(Takings; Due Process), and (to the extent cognizable in federal court) the parallel protections of the Ohio Constitution.

136.     Pursuant to 28 U.S.C. § 2202, Plaintiffs further seek all necessary and proper relief based on that declaration, including injunctive relief under Fed. R. Civ. P. 65.

137.     Plaintiffs and the Class have clear legal rights to have their funds held in trust and available for return.

138.     Defendants have a clear legal duty to preserve such funds solely for their intended custodial purpose.

139.     No adequate remedy at law exists.

140.     Plaintiffs and the Class seek an order from this Court enjoining the Defendants from confiscating  the unclaimed funds in the UFTF.

**COUNT VII**
**ABUSE OF LEGISLATIVE AUTHORITY / ULTRA VIRES ACT**
**(On behalf of Plaintiffs and the Class)**

141.     Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

142.     Plaintiffs assert this claim subject to the Eleventh Amendment and Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984); they seek only declaratory relief to the extent cognizable in federal court and do not request an order compelling state officials to comply with state law, reserving such relief for Ohio courts if necessary.

143.     The General Assembly, in enacting the amendments to R.C. Chapter 169 through HB 96, authorized the executive branch to seize and convert custodial property held in trust for individual Ohioans for the benefit of a private enterprise.

144. The legislative power of the State of Ohio does not include the power to redefine custodial, private property as general revenue in order to subsidize a private enterprise.

145. Nor does any statute or constitutional provision permit the Department of Commerce, the Division of Unclaimed Funds, or the State Treasurer to reclassify property held in trust as State-owned funds.

146. Nor does Ohio's Constitution authorize the appropriation of private property for purely non-public uses.

147. Because the legislature enacted R.C. §169.08(I) in contravention of the requirements and restrictions of Ohio's Constitution, any attempt by Defendants to exercise any of the powers granted thereunder would be ultra vires.

148. Plaintiffs and the Class therefore seek a declaration that such actions are void and unlawful, and further seek appropriate injunctive and equitable relief.

**WHEREFORE** Plaintiffs, individually and on behalf of each member of the proposed Class respectfully requests the Court enter judgment in their favor and for the following specific relief against Defendants as follows:

A. That the Court declare, adjudge, and decree that this action is a proper class action and certify the proposed class under Fed. R. Civ. P. 23(b)(1), (b)(2), and/or (b)(3), appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' Counsel as Class Counsel;

B. Enter a declaratory judgment under 28 U.S.C. §§ 2201–2202 that the proposed confiscation/diversion of unclaimed funds violates the United States Constitution (and, to the extent cognizable here, the Ohio Constitution).

C. Issue temporary, preliminary, and permanent injunctive relief under Fed. R. Civ. P. 65 prohibiting Defendants and those in active concert with them from implementing or enforcing

any provision of HB 96 that diverts, escheats, transfers, or expends monies from the Unclaimed

Funds Trust Fund for stadium construction or any non-custodial purpose;

    D.    Require Defendants to provide constitutionally adequate individualized notice to

affected owners and a constitutionally sufficient opportunity to be heard before any action that

would extinguish or divert their property interests;

    E.    Award Plaintiffs and the Class reasonable attorneys' fees and costs under 42

U.S.C. § 1988; and

    F.    Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues and claims so triable, including any

legal claims that may arise or be asserted in the course of this action. Plaintiffs acknowledge that

the primary relief sought is declaratory and injunctive in nature, but preserves the right to jury

trial on any claims for monetary or other legal relief if warranted by subsequent proceedings or

amendments.

    Respectfully submitted,

    */s/Jeffrey A. Crossman*
    Jeffrey A. Crossman (0073461)
    Marc E. Dann (0039425)
    Brian D. Flick (0081605)
    DannLaw
    15000 Madison Avenue
    Lakewood, OH 44107
    (216) 373-0539
    (216) 373-0536 e-fax
    notices@dannlaw.com

    *Attorneys for Plaintiffs and the Putative Class*