# EXHIBIT A

"Browns Stadium Funding" Memorandum



# OHIO LEGISLATIVE SERVICE COMMISSION

Wendy Zhan, Director

Office of Research and Drafting

Legislative Budget Office

www.lsc.ohio.gov

R-136-1110

**To:** The Honorable Nickie J. Antonio
Ohio Senate

**From:** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**Date:** April 25, 2025

**Subject:** Browns Stadium Funding

Your office sent LSC three questions about the Browns stadium funding provisions of the House-passed version of the budget (H.B. 96). You asked if the language is constitutional, and if the bonds are backed by the full faith and credit of the State of Ohio. You also asked for LBO's "independent analysis of the numbers the Haslam's provided." All three questions are addressed in the following paragraphs.

The bonds as described in House-passed version of H.B. 96 would not be general obligation bonds (i.e., bonds back by the full faith and credit of the State). Rather, they are special obligation, or "revenue obligation" bonds. Whether this means they are constitutional is an open question, and ultimately only a judge could make that determination. LBO staff cannot verify the Haslam Sports Group's (HSG) economic claims because the source material and methodology were not documented in full detail. Nevertheless, the HSG projections implied an outcome that would outperform other similar developments previously studied in peer-reviewed academic literature.

## Bonds – General and Special

There are two basic types of bonds: general obligation bonds and special obligation bonds. Both must be specifically authorized by the Ohio Constitution. In general obligation bonds, or "GO" bonds, the full faith and credit, revenue, and taxing power of the state are pledged to the payment of debt service on the bonds.

Special obligation bonds, on the other hand, are backed only by a specific revenue stream. Generally, there are two types of special obligation bonds – revenue and lease-rental. Revenue bonds are secured by the revenues generated by the specific project or enterprise financed by

the bonds. The General Assembly cannot levy a tax for the purpose of servicing the debt of special obligation bonds.[1]

The major sports facility bonds in H.B. 96 would only be backed by the increased tax revenues generated by the transformational major sports facility mixed-use development.[2] Therefore, they are special obligation bonds, and more specifically revenue bonds. The constitutional prohibition on GO bonds would not prohibit these bonds as written, but whether they are authorized special obligation bonds is another matter.

## Constitutional authority

The Revised Code currently gives the General Assembly the authority to issue bonds for the construction of Ohio sports facilities.[3] However, there does not seem to be a constitutional provision that specifically authorizes issuing bonds for sports facilities.

The authority to issue special obligation bonds comes from Ohio Constitution, Article VIII, Section 2i, in the second to last paragraph. This paragraph permits special bonds for the capital improvements:

> for mental hygiene and retardation, parks and recreation, state supported and state assisted institutions of higher education, including those for technical education, water pollution control and abatement, water management, and housing of branches and agencies of state government.

This does not mention sports or cultural facilities, even though this section is commonly cited as permitting cultural and sports facilities.[4] It may fall under "parks and recreation." The Revised Code section authorizing these bonds lists parks and recreation separately from cultural and sports facilities, and the two have different funds.[5]

However, a sports facility may be considered as "housing an agency of state government."

## *Corbett* Case

In 1993, a group of taxpayers sued the Ohio Building Authority, attempting to enjoin them from selling bonds to pay for the Cincinnati Performing Arts Center. They claimed it was not permissible under Section 2i, as the facility would not "house" a state agency – in this case, the Ohio Arts Facilities Commission (OAFC).

The court sided with the state, saying that 1. The Revised Code stated the functions of the Commission in providing for the development, performance and presentation of the arts include

---

[1] Article VIII, Ohio Constitution.

[2] R.C. 123.28 and 123.281, as amended by the bill.

[3] R.C. 123.28, 123.281, 154.02(Ai)(5), and 154.23.

[4] See, e.g., OBM's page on bonds at obm.ohio.gov/bonds.

[5] R.C. 154.02. There is the Parks and Recreation Improvement Fund (Fund 7035), and the Cultural and Sports Facilities Building Fund (Fund 7030).

"the provision, operation, and management of Ohio arts facilities;" and 2. That "housing" was not so narrow as to only mean office space; it encompassed the Commission's duty to "[o]wn, lease, equip, furnish, administer, and manage Ohio arts facilities," and included "personnel, equipment, or functions" of the OAFC.

Thus, the court found these special obligation bonds for arts facilities were permissible.[6]

The same reasoning potentially applies to sports facilities. Currently, Ohio sports facility projects are administered by the Ohio Facilities Construction Commission (OFCC), which may be the agency "housed," per the *Corbett* case reasoning.

A reviewing court might compare the proposed major sports facility with the Cincinnati Performing Arts Center, examining whether the stadium would "house" the OFCC within the meaning of Section 2i.

Under the bill, the state is required to maintain a sufficient property interest in the stadium such that it maintains "the right to use or to require the use of the major sports facility for the presentation of sport and athletic events to the public."[7]

Ultimately, only a court can determine whether or not it is permissible.

## Economic Impact

An economic impact analysis of the proposed domed stadium and mixed-use development in Brook Park was conducted by consulting firm Robert Charles Lesser & Co. (RCLC) on behalf of the Haslam Sports Group (HSG). While LBO was unable to obtain the full report, the executive summary is publicly available as well as the slides presented to the House Arts, Athletics, and Tourism Committee on March 11, 2025 by Ted Tywang, Chief Administrative Officer and General Counsel of HSG. LBO also acquired a research memorandum authored by Econsult Solutions, Inc. (ESI) for the law firm Squire Patton Boggs. The memorandum estimates the potential net losses of economic impacts for the City of Cleveland resulting from the relocation of the Browns' home stadium to Brook Park and analyzes the market potential for the Brook Park site. All three of these documents are attached to this memorandum.

Since the executive summary of RCLC's analysis does not list many assumptions the firm made or provide the sources of all data employed, LBO is unable to evaluate the analysis in full detail. However, when interpreting the projections of RCLC's analysis, it is useful to consider the academic literature as it provides numerous case studies and investigations on the topic.

### Impact on Employment

The analysis conducted by RCLC claims that the Brook Park project will support 6,000 temporary construction jobs, 5,370 permanent full-time equivalent (FTE) jobs at the site, and 2,540 indirect and induced jobs in Cuyahoga County. An FTE job is a unit of measure used to represent the workload of a fully employed person and may be comprised of more than one

---

[6] *Corbett v. Ohio Bldg. Auth.*, 86 Ohio App.3d 44, 52 (10th Dist.1993).

[7] R.C. 123.281(H)(4)(b) of the bill.

employee. For example, two jobs employing workers for 20 hours a week each sum to a single FTE job.

The projected FTE jobs in Brook Park are comprised of 870 at the stadium, 2,520 in the adjacent mixed-use district to be constructed, and 1,980 at surrounding businesses. It is likely that the 870 stadium jobs will be mostly, or all, relocated jobs from the Browns' current stadium in Cleveland. Therefore, they should not be considered new jobs, but relocated jobs. To a lesser extent, the same may be said for the projected 2,520 FTE jobs in the mixed-use district. Insomuch as the district pulls demand for the goods and services provided away from Cleveland, some of the newly created positions in the mixed-use district will come at the expense of similar jobs in Cleveland.

The projected 1,980 FTE jobs in surrounding businesses is likely an estimate derived from assumptions on what are called "multiplier effects". Multiplier effects are those derived from the secondary circulation of money that was initially spent due to the new development. That is, some of the additional revenues generated by, for example, a winter concert in the new domed stadium will be used by HSG to purchase local goods or services. This secondary spending may cause the suppliers to the stadium to hire more workers or increase the hours of those already employed.

For example, the stadium may contract with a local promoter to advertise the additional winter concerts, who may, in turn, increase the hours of his employees. Academic literature on the employment of such methods documents frequent misuse of multiplier effects to inflate the reported economic impacts of sport stadiums.[8] However, since the publicly available executive summary does not describe the methods used in detail, LBO is unable to critique the multiplier effects assumed in RCLC's executive summary.

The projected 2,520 indirect and induced jobs in Cuyahoga County are also likely derived from assumed multiplier effects. Indirect jobs refer to those created due to increased demand for the goods and services of suppliers and vendors to the stadium. The example of the promoter increasing the hours of his employees above is an example of an indirect job (or partial FTE job). Induced jobs are estimated in a similar fashion but are based on the spending of increased wages received from the initial job creation. For example, some of the additional income received from employees staffing the winter concerts will be spent locally, perhaps at restaurants. The additional spending at restaurants may necessitate additional waiters and cooks, or more hours worked by those already employed.

Similar to the projected permanent FTE jobs in Brook Park, LBO is unable to critique the assumed multipliers used for the indirect and induced jobs in Cuyahoga County as their values were not provided in the executive summary. RCLC does not include an explanation of how the reported 6,000 temporary construction jobs were projected. Therefore, LBO cannot directly critique the figure as it is not clear how it was constructed or whether it also involves multipliers.

---

[8]Crompton, J. L. (1995). Economic impact analysis of sports facilities and events: Eleven sources of misapplication. *Journal of sport management*, *9*(1), 14-35.

Lacking detailed information on how RCLC derived their projections, it is perhaps useful to consider what the academic literature has found on the topic. A recently published peer-reviewed article by three leading sports economists surveyed the literature on the economic impacts of sports stadiums.[9] The authors largely find that the decades of research failed to find significant impacts on employment from the construction of new sports stadiums.

For instance, one surveyed article examined the employment effects of the Colorado Rapids of Major League Soccer leaving Mile High Stadium in Denver (home of the NFL's Denver Broncos) for a newly constructed suburban stadium, similar to what is being proposed by HSG. Neither stadium site was found to have had a significant impact on employment. Note that is not to say that jobs were not relocated from Denver to the suburbs, but rather that the effect was so small that it did not register in the statistical analysis.

Although the literature fails to find an overall positive impact on employment, some studies were identified that found small local positive effects on employment complementary to sports consumption, such as eating and drinking establishments within a mile of the stadium.

### Impact on Economic Growth

RCLC's analysis suggests that the mixed-used development focused around a sports stadium anchor will serve as a catalyst for future economic growth in Cuyahoga County based on several economic studies. Three similar sites are listed as examples of successful projects that spurred further economic growth: (1) The Battery in Atlanta, GA, (2) Titletown in Green Bay, WI, and (3) the Deer District in Milwaukee, WI. The economic studies were not listed in the executive report and so may not be directly evaluated.

However, the academic literature does contain a study on the impact of Major League Baseball's Atlanta Braves moving from the city to the The Battery, which is located in Cobb County, GA. The journal article focuses on commercial assessment values, which should reflect the value of the businesses housed in the properties. The author states,

> Cobb assessment values did not increase relative to other metro-Atlanta counties following the stadiums' announcement or opening, which is inconsistent with the stadium having a positive fiscal impact, even with its desirable location and accompanying mixed-used development. The findings are consistent with past economic studies and are likely generalizable to other stadium projects.[10]

RCLC's executive summary states, "A dome stadium would be additive to attracting different types of major events to Northeast Ohio and generally not competitive to Rocket

---

[9] Bradbury, J. C., Coates, D., & Humphreys, B. R. (2023). The impact of professional sports franchises and venues on local economies: A comprehensive survey. *Journal of Economic Surveys*, *37*(4), 1389-1431.

[10] Bradbury, J. C. (2022). Does hosting a professional sports team benefit the local community? Evidence from property assessments. *Economics of Governance*, *23*(3), 219-252.

Mortgage Field House". [11] On the same page, the report states, "data shows that events are a substitute for travel and entertainment." These two statements are contradictory. Economic theory agrees with the latter: entertainment options at venues such as Rocket Mortgage Arena would be substitutes for those at a new Brook Park site. For example, an individual cannot attend a Taylor Swift concert at the proposed domed stadium and a Cleveland Cavaliers game at Mortgage Arena simultaneously. Even if the events are held on different days, the consumer has a limited budget and may not be able to afford both.

### Impact on Economic Activity

RCLC projects $11 million in additional spending at bars, restaurants, and hotels in downtown Cleveland due to the proposed Brook Park mixed-use development. The authors claim that the stadium will attract an additional 1.5 million visitors, many of whom are assumed to stay in downtown Cleveland after visiting Brook Park. The report also states that 40% of visitors to Huntington Bank Field in 2024 were from out-of-state and that 65% to 75% of visitors at events similar to those held at domed stadiums were from out-of-state. Comments made by Chief Administrative Officer and General Counsel of HSG, Ted Tywang, at the House Arts, Athletics, and Tourism Committee meeting on March 11, 2025 imply that these statistics are derived from ticket sales and are likely accurate.[12] The implication is that a domed stadium in Brook Park would allow for more events that would attract crowds comprised mostly out-of-state visitors.

According to the Venues Design Director at HKS, the Texas-based architecture firm employed by HSG, the proposed stadium in Brook Park will have a capacity up to 70,000 visitors, approximately 3,000 more than Huntington Bank Field. Given the stated average 10 games per season played at home by the Browns, the new stadium would allow for approximately 30,000 more visitors for NFL games.[13] This leaves 1.47 million of the additional visitors to be explained by additional events held at the stadium, equivalent to exactly 21 sold-out events. According to the attached study by Econsults, none of the three closest domes had more than 12 major events (attendance of at least 50,000) in 2023.[14]

The authors also found that the three comparison domes hosted between four to 10 smaller events, such as high school tournaments, conventions, and motocross, but did not list an average attendance of these events. If we instead assume that smaller events at the new Brook Park stadium occupy 50% of the stadium capacity (i.e., 35,000 visitors), and 10 smaller events are

---

[11] RCLCO Real Estate Consulting. (2024) *(Executive Summary) Market Feasibility and Fiscal/Economic Impact*. static.clubs.nfl.com.pdf.

[12] ohiochannel.org/video/ohio-house-arts-athletics-and-tourism-committee-3-11-2025.

[13] With a 17-game schedule, each NFL team hosts eight or nine home games per season. The 10-game average may include assumed playoff appearances or preseason games. It is more likely that preseason games, which may be one or two per season, is included in the figure as the Browns have not had a home playoff game since 1995.

[14] Ford Field in Detroit is reported to have hosted 12 major concerts or events, U.S. Bank Stadium in Minneapolis was reported to have had six such events, and Lucas Oil Stadium in Indianapolis was reported to have had four.

held in addition to 12 sold-out major events with 70,000 visitors – all of which would not occur in any other Ohio stadium otherwise – and that the additional stadium capacity compared to Huntington Bank (3,000) is fully utilized for every Browns game, the Brook Park stadium would only attract 1.22 million new visitors, not 1.5 million.[15] It is important to emphasize that this calculation assumes an optimistic scenario relative to the experiences in comparable cities, suggesting that the estimated 1.5 million new visitors may be overly optimistic.

RCLC's report does not consider how many of these additional events will be relocated from other in-state stadiums. For example, Major League Soccer's Columbus Crew, who are also owned and operated by HSG, relocated their home game against Inter Miami this season to Huntington Bank Field. The purpose of the move was to capitalize on the increased demand to watch Inter Miami's Lionel Messi, widely considered to be the greatest soccer player of all time. The increase in economic activity in Cleveland was therefore created at the cost of revenue that would otherwise have been generated in Columbus. It is likely that future matches where Columbus play teams with international stars will be relocated to the proposed stadium in Brook Park, thereby relocating economic activity away from Columbus.

### Impact on Cleveland

RCLC cites a projected $10 million loss in tax revenue to Cleveland and mention the necessity to consider the city's cost savings on annual debt service, maintenance, capital repairs, insurance, and other gameday operating costs it is required to pay for under the lease agreement with the Browns. However, since the city owns the building and land, it will likely continue to incur maintenance, repair, and insurance costs unless the building is demolished, which would also incur a substantial cost.

The source of the $10 million figure reported by RCLC was not listed, so LBO is unable to evaluate this claim. The attached study carried out by Econsult reports a projected $11 million cost in lost tax revenue for the city. However, many of the criticisms of the RCLC study may also apply to that analysis as the figure is comprised of direct, indirect, and induced tax revenue.

### Conclusion

The academic literature on publicly funded sports stadiums is vast, covering many decades, sports, states, and municipalities. The overwhelming conclusion from this body of research is that there are little to no tangible impacts of sports teams and facilities on local economic activity. A second conclusion is that the level of government subsidies given for the construction of facilities far exceeds any observed economic benefits when they do exist. RCLC's executive summary contains claims that contradict these widely known research findings, but LBO cannot verify RCLC's claims because the source material and methodology were not documented in full detail.

Of final note, RCLC's executive summary cautions against using its projections for the purpose of financing the stadium. The final paragraph states,

---

[15] $(35{,}000 \times 10) + (70{,}000 \times 12) + (3{,}000 \times 10) = 1{,}220{,}000.$

This report is not to be used in conjunction with any public or private offering of securities or other similar purpose where it may be relied upon to any degree by any person other than the client without first obtaining the prior written consent of RCLCO.

## Further Questions

Please let us know if you have any more questions. If you seek further information about the bond issuance or constitutional aspect, you may reach ███████████████████ ███████████████. If you have further questions about the economic impact commissioned by the HSG, please contact ████████████████████████████████████.

Attachments:  R_136_1110 Econsult.pdf
R_136_1110 RCLC.pdf
R_136_1110 slideshow.pdf