OH385 — W55

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 1 of 43 PAGEID #: 97
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Jan 07 3:16 PM-25CV000215

# IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

|  |  |
|---|---|
| MARY BLEICK | ) CASE NO.: |
| | ) |
| and | ) |
| | ) |
| TODD BUTLER | ) |
| | ) |
| and | ) |
| | ) |
| ALLEN SKIERSKI | ) |
| c/o DannLaw | ) |
| 15000 Madison Ave. | ) |
| Lakewood, OH 44107 | ) |
| | ) **VERIFIED COMPLAINT FOR** |
| Plaintiffs, | ) **DECLARATORY, INJUNCTIVE, AND** |
| | ) **OTHER RELIEF with PETITION FOR** |
| vs. | ) **WRIT OF MANDAMUS** |
| | ) |
| SHERYL MAXFIELD, *in her official* | ) |
| *capacity as Director of Commerce* | ) |
| | ) |
| Department of Commerce | ) **Serve also (Pursuant to R.C. §2721.12):** |
| 77 S. High Street, 22nd Floor | ) |
| Columbus, OH 43215-6108 | ) Ohio Attorney General |
| | ) 30 E. Broad St. 14th Floor |
| | ) Columbus, OH 43215 |
| | ) |
| and | ) |
| | ) |
| AKIL HARDY, *in his official capacity as* | ) |
| *Superintendent of the Ohio Division of* | ) |
| *Unclaimed Funds* | ) |
| | ) |
| Department of Commerce | ) |
| 77 S. High Street, 20th Floor | ) |
| Columbus, OH 43215-6108 | ) |
| | ) |
| and | ) |
| | ) |

ROBERT SPRAGUE, *in his official*                    )
*capacity as Treasurer of the State of Ohio*         )
                                                     )
  30 E. Broad Street, 9th Floor                      )
  Columbus, Ohio 43215                               )
                                                     )
                                                     )
            and                                      )
                                                     )
JOY BLEDSOE, *in her official capacity as*           )
*Executive Director of the Ohio Facilities*          )
*Construction Commission*                            )
                                                     )
            Defendants.                              )

Plaintiffs/Relators, Mary Bleick, Todd Butler, and Allen Skierski (collectively referred to hereinafter as "Plaintiffs" and/or "Relators"), individually, as representatives of a class of persons with funds held in trust by the State of Ohio's in the State's unclaimed funds trust account, and on behalf of the State of Ohio, hereby brings these claims against Defendants Sheryl Maxfield, in her official capacity as the Director of Commerce, Akil Hardy, in his official capacity as the Superintendent of the Ohio Division of Unclaimed Funds, Robert Sprague, in his official capacity as Treasurer of the State of Ohio, and Joy Bledsoe, in her official capacity as Executive Director of the Ohio Facilities Construction Commission (collectively "Defendants") and allege upon their personal knowledge and upon information and belief, based on the investigation of counsel and facts that are matters publicly known as follows:

1.      Plaintiffs commence this case to prevent the unconstitutional and unlawful misappropriation of private property held by the State of Ohio as a custodian for individual Ohioans.

OH385 — W57

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 3 of 43 PAGEID #: 99
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 07 3:19 PM-25CV006215

2.        Specifically, the State of Ohio, through the named Defendants/Respondents, intends to confiscate and divert Ohioans' "unclaimed funds" from their intended purpose—to be held and preserved for the benefit of the rightful owners—to finance the construction of a private sports stadium for the Cleveland Browns.

3.        Plaintiffs/Relators are residents of Cuyahoga County, Ohio and bring this action in their individual capacities, on behalf of a putative class of persons affected by the State's conduct as alleged herein, and upon behalf of the State of Ohio in mandamus.

4.        Plaintiffs seek declaratory and injunctive relief under the United States and Ohio Constitutions, as well as Ohio statutory law.

5.        Relators seek a writ of mandamus requiring Respondents to comply with the requirements of the Ohio Constitution, Article I, Section 19.

## INTRODUCTION AND BACKGROUND

### Ohio Changes Its Unclaimed Funds Act to Take Private Property

6.        Plaintiffs and the class described below are rightful owners of property currently held in trust by the State of Ohio pursuant to Ohio Revised Code Chapter 169 in an account otherwise known as the "Unclaimed Funds Account" ("UFA").

7.        The funds held in the UFA by the State of Ohio, pursuant to the statute, are private property held in trust by the State until the rightful owner claims their property.

8.        Each Plaintiff has confirmed, via a review of the public database maintained by the Ohio Division of Unclaimed Funds, that the State is currently holding unclaimed property to which they are entitled, either as original owners or heirs of the original owners. They are entitled to recovery of those funds and thus possess a vested interest in the subject matter of this action.

9.      Ohio's unclaimed funds statute, codified at O.R.C. §169.01, *et seq.*, requires that financial institutions and other holders of personal property turn the property over to the State of Ohio after the statutorily required period set forth in Ohio Revised Code §169.02.

10.     For example, funds found in safe deposit boxes, unreturned deposits for utility services, dormant bank accounts, insurance proceeds, or even mineral dividends, must each be turned over to the State of Ohio after a set period of time, to be held in trust for the rightful owners.

11.     Under the statute in force prior to June 30, 2025, Ohioans had no restrictions on their ability to seek recovery of their property held in the UFA.

12.     However, the State now intends to confiscate the private property held in the UFA for the purpose of funding a private development, depriving the rightful owners of their property.

13.     The State intends to do so even though it has been long settled that funds held by the State of Ohio in its "Unclaimed Funds" account are private property.

14.     The UFA is not property of the State of Ohio to use as it deems fit.

15.     Moreover, unclaimed funds are not properly described as "operating revenue" or a component of the State's "general fund" to be appropriated as part of the State's budget.

16.     As the Ohio Supreme Court stated in 2009, the funds in the UFA "are not abandoned; they are the property of their owner." See Sogg v. Zurz, 121 Ohio St. 3d 449, ¶ 16 (2009) (holding that the state cannot take interest earned on private property).

17.     Nevertheless, Ohio 136th General Assembly recently passed House Bill 96 ("HB 96"), the state's biennium budget legislation, which included amendments to Chapter

4

169 of the Ohio Revised Code directing the State to confiscate and assume ownership of individual Ohioans' unclaimed property for the first time.

18.      Governor DeWine signed HB 96 on or about June 30, 2025 thereby codifying these amendments in Chapter 169.

19.      As signed by the Governor, HB 96 requires the confiscation of funds in the UFA beginning on January 1, 2026 and on a continuing basis going forward.

20.      As signed into law by the Governor, a significant portion of funds in the UFA will automatically "escheat to the State" on January 1, 2026, including property belonging to Plaintiffs and members of the class.  See Amendment to R.C. §169.08(I)(1) set forth in HB 96, p. 406.[1]

21.      Ohioans must now "race the clock" in an attempt to recover their property or the property they are entitled to as heirs of the original property owner, fundamentally altering the property rights of Ohioans and others with claims to property in the UFA.

22.      Many Ohioans remain unaware that their property rights are set to be cut off because the State of Ohio has made little to no effort to reunite unclaimed property to its rightful owners and the amendments to Chapter 196 set forth in HB 96, do not require any notice to individuals who are about to lose their property rights.

23.      Therefore, HB 96, as signed by Governor DeWine, authorized the taking of Ohioans' private property for private development purposes in violation of, *inter alia*, the Fifth and Fourteenth Amendments of the U.S. Constitution, Article I, Section 19 of the Ohio Constitution, and the statutory fiduciary duty imposed by Ohio Revised Code Chapter 169 to preserve the funds for the actual owners of this private property.

---

[1] HB 96 may be viewed on the State's website in its entirety here:
https://www.legislature.ohio.gov/legislation/136/hb96/documents (last visited July 6, 2025).

0H385 — W60

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 6 of 43 PAGEID #: 102
Franklin County Ohio Clerk of Courts of the Common Pleas 2025 Aug 7 9:13 AM-25CV005715

**The State is Taking and Liquidating Ohioans' Property For**
**The Benefit of Private Enterprises**

24.     The "Cleveland Browns" organization is a professional football team which participates in the National Football League.

25.     Both the Cleveland Browns and the National Football League are privately held, for-profit businesses.

26.     Except for the period between 1996-1998, the Cleveland Browns football team has played its home games on Cleveland's lakefront.

27.     Between 1946 and 1995, the Cleveland Browns played their home games in the former Cleveland Municipal Stadium, a publicly owned facility originally constructed in 1931.

28.     Between 1996 and 1998, the Cleveland Browns were defunct after the widely despised owner, Art Modell, relocated the team to Baltimore, MD following the 1995 season.

29.     The resulting public outcry over Art Modell's decision resulted in a series of lawsuits and negotiations ultimately culminating in a settlement involving the City of Cleveland, the Browns' then owner, Art Modell, and the National Football League.  See, e.g. Beder v. Cleveland Browns, 129 Ohio App. 3d 188 (8th Dist. 1999) (providing background of the Cleveland Browns' move); City of Cleveland v. Cleveland Browns, Inc., et al. Cuyahoga County Common Pleas Case No. CV-95-297833 (the city's challenge to the move; settled and dismissed 8/16/1996).

30.     Pursuant to the parties' agreement, the NFL committed to replace the Cleveland Browns with a new football team beginning in 1999 if the City constructed an entirely new facility for the team in time to start the 1999 season.[2]

---

[2] https://www.nytimes.com/1996/02/12/sports/pro-football-how-compromise-built-cleveland-a-new-stadium.html  "How Compromise Built Cleveland a New Stadium." (Last visited Jun 13, 2025).

31.     Among the chief concerns in choosing to rebuild the football stadium on the existing site were the compressed timeline, the ability to leverage the preexisting infrastructure to expedite the completion of the new facility, and the historical significance of this franchise's location on Ohio's "North Coast."

32.     The City built the new stadium, originally named "Cleveland Browns Stadium" signifying the team's identity and connection to the City, by utilizing public funding—over $290 million in taxpayer dollars, including revenue from a "sin tax" approved by Cuyahoga County voters, along with financing provided by the National Football League.

33.     Since the new stadium's completion in 1999, the Cleveland Browns have played their home games at this publicly owned facility.

34.     The construction of this new public facility allowed for the continuation of the long legacy of professional football on Cleveland's lakefront that dates back to the 1930's, when the Cleveland Rams—a franchise which later relocated to Los Angeles—played their home games in Cleveland Municipal Stadium.

35.     Including both the Rams and the Browns, professional football has played home games on the city's historic lakefront site in a publicly owned and operated facility for nearly a century.

36.     On or about March 18, 2025, the current owner of the Cleveland Browns franchise announced plans to abandon the Cleveland Browns' long legacy of playing home games in the City and pursue the construction of a new, but privately owned facility outside of Cleveland at a cost projected to exceed $2 billion.[3]

---

[3] https://www.news5cleveland.com/sports/browns/city-of-cleveland-calls-press-conference-for-update-on-the-status-of-stadium-negotiations "Browns leaving Downtown Cleveland for Brook Park." (Last visited July 6, 2025).

37.     Upon information and belief, the Cleveland Browns organization is controlled by Haslam Sports Group, LLC which is owned and operated by multi-billionaire Jimmy Haslam and his wife Dee Haslam.

38.     According to Forbes magazine, Jimmy Haslam is one of the wealthiest individuals in the world and, if his home were in Ohio, he would be the wealthiest person in Ohio.[4]

39.     The proposed new stadium is a private venture and, upon information and belief, fully controlled by Haslam and/or the Haslam Sports Group.  The public would not have any ownership or other rights in this private venture.

40.     Nevertheless, the Haslam Sports Group and Haslam have sought *public* funding for their thoroughly *private* venture to cover approximately half the cost of the facility's construction, and while the Haslam Sports Group claim that monies provided could be returned, at least two state agencies have concluded that the economic forecasts provided by the developers are wildly optimistic and the community benefits touted are unlikely to materialize.[5]

41.     In fact, beyond speculative economic benefit to the government and community, there is no public purpose for the proposed project and any claimed economic

---

[4] https://www.beaconjournal.com/story/news/2025/04/04/2025-forbes-billionaires-list-ohio-natives-lebron-james-vivek-ramaswamy-haslam/82874307007/ "Akron native LeBron James, Vivek Ramaswamy, more Ohioans make Forbes billionaires list" (last visited July 6, 2025).  Since Mr. Haslam's personal residence is in Tennessee, he is not included on the list of wealthiest Ohioans but if he were, he'd surpass Ohio's current No. 1, Les Wexner, the founder of Limited Brands.

[5] https://www.news5cleveland.com/sports/browns/state-agencies-flag-browns-stadium-plans-browns-say-analysis-contains-misinformation#:~:text=In%20the%20memo%2C%20the%20researchers,broadcast%2C%20rewritten%2C%20or%20redistributed.  "State agencies flag Browns' stadium plans." (Last visited July 6, 2025).

OH385 — W63
Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 12/06/25 Page: 9 of 43 PAGEID #: 105
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 07 9:16 AM-25CV005715

benefits are a mere pretext used as an attempt to justify public funding for a thoroughly private project. As the nonpartisan Legislative Service Commission, which serves the Ohio General Assembly wrote in a memorandum to state legislators:

> *"The academic literature on publicly funded sports stadiums is vast, covering many decades, sports, states and municipalities...The overwhelming conclusion from this body of research is that there are little to no tangible impacts of sports teams and facilities on local economic activity. A second conclusion is that the level of government subsidies given for the construction of facilities far exceeds any observed economic benefits when they do exist." .*

<u>See</u> "Browns Stadium Funding" Memorandum dated April 25, 2025 attached hereto as **Exhibit A**.

42.     Given the absence of a legitimate public purpose for this private venture, it is fair to ask why the state legislature would authorize the liquidation of private property belonging to individual Ohioans to fund a privately owned stadium—particularly in a manner that infringes upon the constitutional rights of Ohioans. The answer appears rooted not in sound public policy or constitutional principle, but in political expediency and the influence of wealthy political donors.

43.     Public records and reporting indicate that Jimmy and Dee Haslam were among the largest contributors to the campaign opposing "Issue 1" in November 2024.[6]

44.     These donations, made concurrent with the Haslam Sports Group's pursuit of public funding for their stadium project, raise legitimate concerns about the potential influence

---

[6] https://www.wkyc.com/article/news/politics/elections/cleveland-browns-owners-jimmy-dee-haslam-largest-donors-campaign-defeat-ohio-redistricting-amendment/95-d6bb895d-fde6-42f5-9435-b92aa4c25338 "Jimmy and Dee Haslam among largest donors in campaign to defeat Ohio redistricting amendment" (last visited July 6, 2025).

of such contributions on legislative decision-making and the support sought to help pay for the Haslams' $2 billion boondoggle.[7]

45. The Haslams' support was crucial to the failure of Issue 1, which represented a win for the Ohio House Speaker who opposed Issue 1 because, if it had passed, it would have dealt a blow to the Speaker's ability to gerrymander legislative districts and threatened his party's ability to retain supermajority in the statehouse. It appears that the Speaker's support for public funding for the Haslams' private project is the reward for the Haslams' direct support on defeating Issue 1.

46. What makes the State's stadium funding proposal particularly disturbing is not just its abandonment of a historic public asset, the severing of the team's long-standing connection to the City, or the unmistakable appearance of "pay to play" political favoritism that taints its origins—but the deeply inappropriate decision to finance a private development project by raiding a trust fund meant to safeguard the private property of unsuspecting Ohioans.

47. The State decided to pay for this private development by confiscating and liquidating funds in Ohio's UFA— property that legally belongs to individual Ohio residents — to finance this new, privately owned stadium project at the expense of those who have funds waiting to be claimed and which are supposed to be held in trust.

48. The state's plan involves taking private property for the purpose of benefiting a private business and, in particular, one person (Jimmy Haslam) who is more than financially

---

[7] Merriam Webster defines the term "boondoggle" as "a wasteful or impractical project or activity often involving graft." https://www.merriam-webster.com/dictionary/boondoggle

0H385 - W65
Case 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page 71 of 42 PAGEID #: 107
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 07 3:16 PM-25CV005715

capable of funding the construction of his own privately operated football stadium, as other multi-billionaire franchise owners have done (albeit a minority).[8]

49.     Even the Ohio Attorney General urged the Governor to veto this drastic change given that it fundamentally alters Ohioans' rights to "**their** monies" and is likely to cause many to "lose out due to this change."  See Letter from the Ohio Attorney General to Governor DeWine dated June 27, 2025, attached hereto as **Exhibit B**.

50.     The Ohio Attorney General acknowledged that "the statutory taking of public funds without a clear public benefit is poor policy." Id.

51.     Poor policy indeed—it represents an unconstitutional taking and violates Ohio's longstanding acknowledgment that "Ohio has always considered the right of property to be a fundamental right."  See City of Norwood v. Horney, 110 Ohio St.3d 353, ¶38 (2006).

52.     Plaintiffs are residents of the State of Ohio, and each has verified that they have unclaimed funds held in the UFA, which are listed on the Ohio Division of Unclaimed Funds' website and now subject to escheatment.

53.     Defendant, Sheryl Maxfield is the State of Ohio's Director of Commerce, which oversees the Division of Unclaimed Funds, the governmental office responsible for reuniting Ohioans with their property.

54.     According to HB 96, the "director of commerce" must certify funds from the UFA and redirect these funds to the State Treasurer to ensure that they are available for the construction of the private venture.  See HB 96, p. 406.

---

[8] https://theweek.com/sports/taxpayer-subsidized-stadiums?utm_source=chatgpt.com "The economics of taxpayer-subsidized stadiums" (last visited July 6, 2025).

0H385 - W66
Case 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 12 of 43 PAGEID #: 108
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Jul 31 1:46 PM-25CV005715

55.     R.C. 169.01(K) also authorizes Defendant Akil Hardy, as the "superintendent of unclaimed funds" to redirect these unclaimed funds to the State Treasury.

56.     Defendant, Robert Sprague, acting in his capacity as Treasurer for the State of Ohio, is charged with the responsibility of maintaining, supervising, securing, and accounting of funds held by the State of Ohio, including Ohio's unclaimed funds.

57.     Defendant, Joy Bledsoe, acting in her capacity as the Executive Director for the Executive Director of the Ohio Facilities Construction Commission is charged with the responsibility of utilizing the confiscated funds from the UFA for the newly created "Cultural, Sports, and Major Sports Facilities Grant Fund" and expending at least $600,000 of the funds generated from the taking of Ohioans' private property to help pay for the Cleveland Browns' stadium project.

58.     The State's plan to confiscate Ohioans' private property includes a directive that Defendant Sprague confiscate the unclaimed funds certified by the "director of commerce" and divert them into a separate fund to be utilized to finance the construction of a private sports facility.

59.     Defendants are acting under the color of law to exercise this taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the Ohio Constitution.

60.     On or about January 1, 2026, Defendants are statutorily obligated to confiscate and redirect at least $1 Billion from the UFA to the newly created "Ohio Cultural and Sports Facility Performance Grant Fund" which will be administered by Defendant Bledsoe. This imminent action, required by law already enacted, places Plaintiffs and the putative class at immediate risk of losing their property and constitutional rights.

OH385 — W67

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 13 of 43 PAGEID #: 109
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Sep 19 1:47 AM-25CV006715

61. In light of HB 96, Plaintiffs and similarly situated individuals are now placed in the untenable position of having to race against a statutory deadline, without adequate notice or legal clarity, in order to prevent forfeiture of their property.

62. The State has not provided direct notice to property owners, and the sudden reclassification of custodial property as state property subjects Plaintiffs to an imminent risk of loss without due process and other constitutional l protections.

## CLASS ACTION ALLEGATIONS

63. Plaintiffs/Relators bring this action individually and on behalf of all others similarly situated, pursuant to Civ.R. 23(A) and Civ. R. 23(B)(2).

64. The proposed class is defined as:

> **"All individuals and entities whose funds are being held in the Ohio Unclaimed Funds Trust Fund as of June 30, 2025.**"

65. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

66. Plaintiffs reserve the right to amend the above definitions or to propose subclasses in subsequent pleadings and motions for class certification.

67. <u>Numerosity</u>: The class is so numerous that joinder of all members is impracticable. Upon information and belief, the class includes tens or hundreds of thousands of individuals with unclaimed funds in the custody of the State of Ohio.

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 74 of 43 PAGEID #: 110
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Sep 03 11:14 AM-25CV006075
0H385 - W68

68. <u>Commonality</u>: There are questions of law and fact common to the class, including but not limited to:

  a. Whether the State of Ohio and its officers have a fiduciary duty to preserve unclaimed private property for the rightful owners;

  b. Whether confiscating an individual's property without a public purpose constitutes an unconstitutional taking;

  c. Whether confiscating private property to fund a private stadium project constitutes an unconstitutional taking;

  d. Whether confiscating private property in the absence of a state emergency without compensating the owner first violates Article I, section 19 of Ohio's Constitution;

  e. Whether the proposed confiscation of private property violates due process rights;

  f. Whether such confiscation violates the purpose of ORC Chapter 169.

69. <u>Typicality</u>: Plaintiffs'/Relators' claims are typical of the claims of the class. Plaintiffs/Relators and class members all have a current or potential claim to unclaimed funds held in trust, and all are subject to the same risk of diversion of their property without notice or compensation.

70. <u>Adequacy of Representation</u>: Plaintiffs/Relators will fairly and adequately protect the interests of the class. Plaintiffs/Relators have no interests antagonistic to the class and are represented by competent counsel experienced in complex litigation, constitutional claims, and class actions.

71.     Plaintiffs/Relators are not subject to any individual defenses unique from those conceivably applicable to other Class Members or the class in its entirety. Plaintiff/Relators anticipate no management difficulties in this litigation.

72.     <u>Superiority of Class Action</u>: Since the damages suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation by each member make or may make it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein. Should separate actions be brought or be required to be brought by each individual member of the Class, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants.

73.     The prosecution of separate actions would also create a risk of inconsistent rulings, which might be dispositive of the interests of the Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests adequately.

74.     Defendants/Respondents have acted or refused to act on grounds generally applicable to the class, thereby making final injunctive and declaratory relief appropriate with respect to the class as a whole under Rule 23(B)(2). Class certification is appropriate to ensure uniform and equitable adjudication of the legal and constitutional rights of all unclaimed fund beneficiaries.

## **JURISDICTION AND VENUE**

75.     This Court has jurisdiction under R.C. 2721.01 et seq. (Declaratory Judgment Act), R.C. 2727.03 (Injunctions), R.C. 2305.01 (common pleas jurisdiction), R.C. 2731.01, et seq., (Mandamus) and Article IV, Section 4(B) of the Ohio Constitution.

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 16 of 42 PAGEID #: 112
0H385 - W70
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 07 3:10 PM-25CV005715

76.     Jurisdiction is also proper in this Court pursuant to §2743.03(A)(2) which permits parties to seek declaratory relief against the State and its actors in Common Pleas Court.  See Cirino v. Ohio Bureau of Workers' Comp., 153 Ohio St. 3d 333, ¶¶19-20 (2018)(discussing claims that may be brought in Common Pleas versus claims that must be brought in the Court of Claims).

77.     Venue is proper in Franklin County pursuant to Civ. R. 3(C) and Civ. R. 3(C)(4) because Defendants/Respondents perform their official duties in Franklin County.  Venue is also proper pursuant to Civ. R. 3(C)(5) as the UFA is administered by the Defendants/Respondents in Franklin County.

78.     The State of Ohio currently holds approximately $4.7 Billion in unclaimed funds, property of Ohioans, pursuant to R.C. 169.01, et seq.

79.     Each of the named Plaintiffs/Relators are owners of property currently held in the custody of the Division of Unclaimed Funds.

80.     Moreover, upon information and belief, Plaintiffs/Relators are entitled to a claim on property held in the UFA as an heir of the original property owner.

81.     Until June 30, 2025, Ohio held these funds strictly in a fiduciary capacity for the exclusive benefit of its rightful owners.

82.     However, on June 30, 2025, Governor DeWine signed HB 96 into law, thereby altering Plaintiff's relationship with their unclaimed property thereby imminently threatening the taking of their private property.

83.     The funds in the UFA are not surplus and must remain available to pay verified claims by owners or their heirs, including Plaintiff.

16

0H385 - W71

Case 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 17 of 43 PAGEID #: 113
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Sep 03 1:16 PM-25CV006315

84.     Unless enjoined, Defendants/Respondents will immediately effectuate this planned confiscation pursuant to newly imposed statutory obligations. These steps include certification of fund balances, movement of funds, and preparation for disbursement, thereby endangering the solvency of the UFA and placing private property at immediate risk of dissipation.

## COUNT I
## TAKINGS CLAUSE
## (U.S. CONST. amend. V, XIV; 42 U.S.C. § 1983)
## (On behalf of Plaintiff and the Class)

85.     Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

86.     Plaintiffs have vested property interest in unclaimed funds held by the State.

87.     Defendants intend to reallocate those funds for private use without just compensation or due process.

88.     This constitutes a violation of the Takings Clause set forth in the United States Constitution, as amended by the Fifth Amendment in the Bill of Rights.

89.     The Fifth Amendment says in pertinent part that: "No person shall be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

90.     Defendants intend to take the described actions, under color of state law, without affording Plaintiffs and the Class due process and without paying just compensation prior to the taking, thereby violating the United States Constitution.

91.     Defendants intend to take the described actions, under color of state law, not for a public purpose, but solely to benefit a private enterprise.

0H385 - W72

Case 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 18 of 43 PAGEID #: 114
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Jun 03 1:10 PM-25CV005715

92.    As a result, Plaintiffs are entitled to declaratory and injunctive relief and attorneys' fees under 42 U.S.C. § 1988.

## COUNT II
## DUE PROCESS CLAUSE
### (U.S. CONST. amend. XIV; 42 U.S.C. § 1983)
### (On behalf of Plaintiff and the Class)

93.    Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

94.    There is no provision in H.B. 96 to provide Plaintiffs any direct notice or opportunity to object to the confiscation of their property as contemplated by the bill.

95.     The Fifth Amendment to the United States Constitution prohibits, inter alia, deprivation of property rights without due process of law- notice and an opportunity to be heard.

96.    The Fourteenth Amendment to the United States Constitution, applies the restrictions of the Fifth Amendment to the States.

97.    By confiscating the funds of Plaintiffs and others in the putative class without providing for adequate notice and an opportunity to be heard, Defendants' imminent actions violate these Amendments to the U.S. Constitution.

98.    As a result, Plaintiffs are entitled to declaratory and injunctive relief and attorneys' fees under 42 U.S.C. § 1988.

## COUNT III
## VIOLATION OF ARTICLE I, SECTION 19, OHIO CONSTITUTION
### (On behalf of Plaintiff and the Class)

99.    Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

18

0H385 - W73

Case 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 19 of 43 PAGEID #: 115
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Oct 31 9:17 AM-25CV006775

100.   Similar to the United States Constitution, Ohio's Constitution also protects private property from being taken for private use or without just compensation.

101.   In fact, Ohio's Constitutional protections are stronger than the Federal Constitution.

102.   Article I, Section 19 of the Ohio Constitution states as follows:

> Private property shall ever be held inviolate, but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money, and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner.

103.   This constitutional provision states that private property shall be "inviolate," signifying that the protection and preservation of private property is a fundamental principle of Ohio's constitutional order.

104.   This provision also mandates that compensation be paid to the private property owner in one of two situations:  (a) when there is a "public emergency" such as a war or a natural disaster, the Constitutional provision permits a taking but requires compensation at some point, presumably after the emergency ends, (b) in non-emergency situations, the State of Ohio must pay the private property owner *before* the taking occurs.

105.   The proposed taking at issue in this situation is a non-emergency situation.

106.   Defendants intend to seize and divert the private property of Plaintiffs and members of the class without first compensating the those to whom this property belongs and without notice.

107.   Moreover, the taking itself appears to violate Ohio's constitution as interpreted by the Ohio Supreme Court in <u>City of Norwood v. Horney</u>, 110 Ohio St. 3d 353 (2006), which

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 20 of 43 PAGEID #: 116
Franklin County Ohio Clerk of Courts of the Common Pleas - 2025 Sep 19 1:54 PM-25CV006315

0H385 - W74

stands for the proposition that an individual's property cannot be taken for a non-public purpose.

108.    In the <u>City of Norwood</u> case, the Ohio Supreme Court held that "although economic factors may be considered in determining whether private property may be appropriated, the fact that the appropriation would provide an economic benefit to the government and community, standing alone, does not satisfy the public-use requirement of Section 19, Article I of the Ohio Constitution." <u>Id.</u> at ¶ 9.

109.    Given the complete absence of a public purpose or any public benefit whatsoever, the proposed taking violates Ohio's Constitution.

110.    The State's directive to Defendants to seize private property and to redirect this property violates the Ohio Constitution and entitles Plaintiffs and the class members to declaratory and injunctive relief.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY UNDER R.C. 169.01, <i>et seq.</i>**
**(On behalf of Plaintiff and the Class)**

111.    Plaintiff hereby incorporates all of the foregoing paragraphs, as if fully rewritten herein.

112.    The State holds unclaimed funds as a trustee and has no right in the monies held in the UFA.

113.    Until the passage of H.B. 96, R.C. §169.05 did not authorize or permit the use of UFA for private development.

114.    Both the alteration of the property rights of Plaintiffs and the members of the class along with the eventual confiscation of these private funds for a private use constitutes a breach of the State's fiduciary duty to Plaintiffs and the Class.

0H385 - W75

Case 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 21 of 43 PAGEID #: 117
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Sep 03 10:44 AM-25CV006015

## COUNT V
## VIOLATION OF THE OHIO CONSTITUTION – SINGLE SUBJECT RULE
### (Ohio Const., Art. II, § 15(D))
### (On behalf of Plaintiff and the Class)

115.    Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

116.    Article II, Section 15(D) of the Ohio Constitution provides that: "No bill shall contain more than one subject, which shall be clearly expressed in its title."

117.    The purpose of this provision in the State Constitution is to place "concrete limits on the power of the General Assembly to proceed however it saw fit in the enactment of legislation." State ex rel. Ohio Acad. of Trial Lawyers v. Sheward 86 Ohio St. 3d 451, 495 (1999).

118.    The State's budget bill is an appropriation of the State's general revenue funds.

119.    The Unclaimed Funds Trust Fund is established under R.C. Chapter 169 and is unrelated in subject matter or legal purpose to capital expenditures on private stadium development.

120.    The inclusion of stadium financing language in a general operating or biennial budget bill violates the single subject rule because:

    a.    The provision authorizing the confiscation and diversion of custodial unclaimed funds to subsidize a private stadium project bears no rational relationship to the general subject of the State's operating budget. It constitutes a distinct and controversial public policy initiative that was improperly inserted into a must-pass appropriations bill, thereby obscuring the issue from meaningful public scrutiny and legislative deliberation;

    b.    The amendment seeks to use the budget process as a procedural shield for an otherwise unconstitutional taking of private property, frustrating transparency and denying affected citizens fair notice of their rights being extinguished;

0H385 — W76

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 22 of 43 PAGEID #: 118
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 07 3:18 PM-25CV006015

    c.   The title of H.B. 96 fails to disclose any reference to the seizure or redirection of unclaimed funds for private real estate development, thereby violating the requirement that legislation give fair notice of its subject matter;

    d.   The inclusion of this stadium funding mechanism in HB 96 jeopardizes the fiscal integrity of the Unclaimed Funds Account—an account in which Plaintiffs and members of the putative class hold legal property interests—without any factual findings or legislative record supporting the impact on solvency or risk to the trust corpus; and

    e.   Amendments to R.C. §169.01, et seq. were inserted into H.B. 96 during the final days of legislative proceedings, without public debate, committee hearings, or any meaningful opportunity for review by either legislators or the general public.

121.    Because the amendment to R.C. 169.08 offends the single-subject rule, the amendment is unconstitutional and void.

## COUNT VI
## INJUNCTIVE RELIEF UNDER OHIO LAW (R.C. 2727.01 et seq.)
### (On behalf of Plaintiff and the Class)

122.    Plaintiffs hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

123.    At all relevant times, there was also in effect a declaratory judgment statute in the Ohio Revised Code, R.C. 2727.01, *et seq.*

124.    A current and ongoing controversy exists between Plaintiffs and the Class and Defendants as Plaintiffs and the Class will suffer irreparable harm if the proposed confiscation of the unclaimed funds is not enjoined.

125.    Plaintiffs and the Class have clear legal rights to have their funds held in trust and available for return.

126.     Defendants have a clear legal duty to preserve such funds solely for their intended custodial purpose.

127.     No adequate remedy at law exists.

128.     Plaintiff and the Class seek an order from this Court enjoining the Defendants from confiscating the unclaimed funds in the Unclaimed Funds Trust Account.

<u>**COUNT VII**</u>
**MANDAMUS**
**(On behalf of Relators and the Class)**

129.     Relators hereby incorporate all of the foregoing paragraphs, as if fully rewritten herein.

130.     This Court possesses the authority to issue a writ of mandamus pursuant to O.R.C.§2731.01, et. seq.

131.     Mandamus is the proper vehicle for compelling appropriation proceedings by public authorities where an involuntary taking of private property is alleged.

132.     Pursuant to Art. I, Sec. 19 of Ohio's Constitution, prior to the government taking private property, property owners are entitled to just compensation, as determined by a jury.

133.     Under the Fifth and Fourteenth Amendments of the United States Constitution, and Article I, Section 16 of the Ohio Constitution, property owners are entitled to sufficient pre-seizure notice and a hearing regarding a proposed governmental action that affects their property rights.

134.     R.C. 169.08(I), as enacted through HB 96, seeks to circumvent the constitutional requirement for pre-taking payment of compensation, as established by a jury.

135.   R.C. §169.08(I), as enacted through HB 96, provides no method for notice to, or a hearing for, individuals such as Relators, who stand to have their property taken by the State.

136.   The right to pre-payment of just compensation, as established by a jury, and the right to notice and hearing prior to taking of private property are fundamental constitutional rights afforded to all, and the government may not abrogate those rights in the name of expediency or convenience.

137.   Relators and the Class lack an adequate remedy at law for these violations of their Constitutional rights.

138.   Given the fundamental nature of the right at issue in this matter, as set forth in the United States and Ohio Constitutions, Respondents have a clear legal duty 1) to provide individualized notice to each affected property owner about the proposed taking of their property, 2) to provide the opportunity for a pre-taking hearing to each affected property owner about the proposed taking of their property, 3) to have a jury determine the just compensation due each affected property owner for the appropriation of their property, and 4) to order payment of such just compensation to each affected property owner prior to seizure of the property.

139.   Relators and the Class are therefore entitled to the issuance of a writ of mandamus directing Respondents to comply with their legal duties as set forth above.

## COUNT VIII
### ABUSE OF LEGISLATIVE AUTHORITY / ULTRA VIRES ACT
#### (On behalf of Plaintiff and the Class)

140.   Plaintiff hereby incorporates all of the foregoing paragraphs, as if fully rewritten herein.

0H385 - W79

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 25 of 43 PAGEID #: 121
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 07 3:16 PM-25CV005215

141.   The General Assembly, in enacting the amendments to R.C. Chapter 169 through HB 96, authorized the executive branch to seize and convert custodial property held in trust for individual Ohioans for the benefit of a private enterprise.

142.   The legislative power of the State of Ohio does not include the power to redefine custodial, private property as general revenue in order to subsidize a private enterprise.

143.   Nor does any statute or constitutional provision permit the Department of Commerce, the Division of Unclaimed Funds, or the State Treasurer to reclassify property held in trust as State-owned funds.

144.   Nor does Ohio's Constitution authorize the appropriation of private property for purely non-public uses.

145.   Because the legislature enacted R.C. §169.08(I) in contravention of the requirements and restrictions of Ohio's Constitution, any attempt by Respondents to exercise any of the powers granted thereunder would be ultra vires.

146.   Plaintiffs and the Class therefore seek a declaration that such actions are void and unlawful, and further seek appropriate injunctive and equitable relief.

**WHEREFORE**, Plaintiffs, individually and on behalf of each member of the proposed Class respectfully requests the Court enter judgment in their favor and for the following specific relief against Defendants as follows:

A.   That the Court declare, adjudge, and decree that this action is a proper class action and certify the proposed class and/or any other appropriate subclasses under Civ.R. 23(b)(1), (b)(2), and/or (b)(3), appoint Plaintiffs as a Class Representatives and appoint Plaintiffs' Counsel as Class Counsel;

B.      Enter a declaratory judgment that the proposed confiscation and/or diversion of unclaimed funds violates the United States and Ohio Constitutions and R.C. §169.01, *et seq.*;

C.      Issue temporary, preliminary, and permanent injunctive relief prohibiting Defendants from reallocating or approving the use of unclaimed funds for private stadium construction and mandating notice to every person who may have property confiscated, diverted, or their rights to their property cut off;

D.      Award Plaintiff and the Class reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

E.       Issue a writ of mandamus directing Respondents 1) to provide individualized notice to Relators and the Class about the proposed taking of their property, 2) to provide the opportunity for a pre-taking hearing to to Relators and the Class about the proposed taking of their property, 3) to have a jury determine the just compensation due Relators and the Class for the appropriation of their property, and 4) to order payment of such just compensation to Relators and the Class prior to seizure of the property. In the alternative, issue an alternative writ requiring Respondents to show cause why the identified provisions of H.B. 96 do not offend  the enumerated constitutional provisions; and

F.      Grant any other relief the Court deems just and proper.

26

OH385 - W81

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues and claims so triable under Ohio law, including any legal claims that may arise or be asserted in the course of this action. Plaintiff acknowledges that the primary relief sought is declaratory and injunctive in nature but preserves the right to jury trial on any claims for monetary or other legal relief if warranted by subsequent proceedings or amendments.

Respectfully submitted,


*/s/ Jeffrey A. Crossman*
Jeffrey A. Crossman (0073461)
Marc E. Dann (0039425)
Brian D. Flick (0081605)
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539
(216) 373-0536 e-fax
notices@dannlaw.com

*Attorneys for Plaintiffs and the Putative Class*

Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 07 3:19 PM-25CV005715

# EXHIBIT A

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 29 of 43 PAGEID #: 125
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Jul 31 1:14:25 CV000...



# OHIO LEGISLATIVE SERVICE COMMISSION

Wendy Zhan, Director

www.lsc.ohio.gov

Office of Research
and Drafting

Legislative Budget
Office

R-136-1110

**To:** The Honorable Nickie J. Antonio
Ohio Senate

**From:** ▮▮▮▮▮▮▮▮▮ ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ ▮▮

**Date:** April 25, 2025

**Subject:** Browns Stadium Funding

Your office sent LSC three questions about the Browns stadium funding provisions of the House-passed version of the budget (H.B. 96). You asked if the language is constitutional, and if the bonds are backed by the full faith and credit of the State of Ohio. You also asked for LBO's "independent analysis of the numbers the Haslam's provided." All three questions are addressed in the following paragraphs.

The bonds as described in House-passed version of H.B. 96 would not be general obligation bonds (i.e., bonds back by the full faith and credit of the State). Rather, they are special obligation, or "revenue obligation" bonds. Whether this means they are constitutional is an open question, and ultimately only a judge could make that determination. LBO staff cannot verify the Haslem Sports Group's (HSG) economic claims because the source material and methodology were not documented in full detail. Nevertheless, the HSG projections implied an outcome that would outperform other similar developments previously studied in peer-reviewed academic literature.

## Bonds – General and Special

There are two basic types of bonds: general obligation bonds and special obligation bonds. Both must be specifically authorized by the Ohio Constitution. In general obligation bonds, or "GO" bonds, the full faith and credit, revenue, and taxing power of the state are pledged to the payment of debt service on the bonds.

Special obligation bonds, on the other hand, are backed only by a specific revenue stream. Generally, there are two types of special obligation bonds – revenue and lease-rental. Revenue bonds are secured by the revenues generated by the specific project or enterprise financed by

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 30 of 43 PAGEID #: 126
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 01 11:25 AM-25CV005921

the bonds. The General Assembly cannot levy a tax for the purpose of servicing the debt of special obligation bonds.[1]

The major sports facility bonds in H.B. 96 would only be backed by the increased tax revenues generated by the transformational major sports facility mixed-use development.[2] Therefore, they are special obligation bonds, and more specifically revenue bonds. The constitutional prohibition on GO bonds would not prohibit these bonds as written, but whether they are authorized special obligation bonds is another matter.

# Constitutional authority

The Revised Code currently gives the General Assembly the authority to issue bonds for the construction of Ohio sports facilities.[3] However, there does not seem to be a constitutional provision that specifically authorizes issuing bonds for sports facilities.

The authority to issue special obligation bonds comes from Ohio Constitution, Article VIII, Section 2i, in the second to last paragraph. This paragraph permits special bonds for the capital improvements:

> for mental hygiene and retardation, parks and recreation, state supported and state assisted institutions of higher education, including those for technical education, water pollution control and abatement, water management, and housing of branches and agencies of state government.

This does not mention sports or cultural facilities, even though this section is commonly cited as permitting cultural and sports facilities.[4] It may fall under "parks and recreation." The Revised Code section authorizing these bonds lists parks and recreation separately from cultural and sports facilities, and the two have different funds.[5]

However, a sports facility may be considered as "housing an agency of state government."

## *Corbett* Case

In 1993, a group of taxpayers sued the Ohio Building Authority, attempting to enjoin them from selling bonds to pay for the Cincinnati Performing Arts Center. They claimed it was not permissible under Section 2i, as the facility would not "house" a state agency – in this case, the Ohio Arts Facilities Commission (OAFC).

The court sided with the state, saying that 1. The Revised Code stated the functions of the Commission in providing for the development, performance and presentation of the arts include

---

[1] Article VIII, Ohio Constitution.

[2] R.C. 123.28 and 123.281, as amended by the bill.

[3] R.C. 123.28, 123.281, 154.02(Ai)(5), and 154.23.

[4] See, e.g., OBM's page on bonds at obm.ohio.gov/bonds.

[5] R.C. 154.02. There is the Parks and Recreation Improvement Fund (Fund 7035), and the Cultural and Sports Facilities Building Fund (Fund 7030).

Office of Research and Drafting      LSC      Legislative Budget Office

"the provision, operation, and management of Ohio arts facilities;" and 2. That "housing" was not so narrow as to only mean office space; it encompassed the Commission's duty to "[o]wn, lease, equip, furnish, administer, and manage Ohio arts facilities," and included "personnel, equipment, or functions" of the OAFC.

Thus, the court found these special obligation bonds for arts facilities were permissible.[6]

The same reasoning potentially applies to sports facilities. Currently, Ohio sports facility projects are administered by the Ohio Facilities Construction Commission (OFCC), which may be the agency "housed," per the *Corbett* case reasoning.

A reviewing court might compare the proposed major sports facility with the Cincinnati Performing Arts Center, examining whether the stadium would "house" the OFCC within the meaning of Section 2i.

Under the bill, the state is required to maintain a sufficient property interest in the stadium such that it maintains "the right to use or to require the use of the major sports facility for the presentation of sport and athletic events to the public."[7]

Ultimately, only a court can determine whether or not it is permissible.

# Economic Impact

An economic impact analysis of the proposed domed stadium and mixed-use development in Brook Park was conducted by consulting firm Robert Charles Lesser & Co. (RCLC) on behalf of the Haslam Sports Group (HSG). While LBO was unable to obtain the full report, the executive summary is publicly available as well as the slides presented to the House Arts, Athletics, and Tourism Committee on March 11, 2025 by Ted Tywang, Chief Administrative Officer and General Counsel of HSG. LBO also acquired a research memorandum authored by Econsult Solutions, Inc. (ESI) for the law firm Squire Patton Boggs. The memorandum estimates the potential net losses of economic impacts for the City of Cleveland resulting from the relocation of the Browns' home stadium to Brook Park and analyzes the market potential for the Brook Park site. All three of these documents are attached to this memorandum.

Since the executive summary of RCLC's analysis does not list many assumptions the firm made or provide the sources of all data employed, LBO is unable to evaluate the analysis in full detail. However, when interpreting the projections of RCLC's analysis, it is useful to consider the academic literature as it provides numerous case studies and investigations on the topic.

## Impact on Employment

The analysis conducted by RCLC claims that the Brook Park project will support 6,000 temporary construction jobs, 5,370 permanent full-time equivalent (FTE) jobs at the site, and 2,540 indirect and induced jobs in Cuyahoga County. An FTE job is a unit of measure used to represent the workload of a fully employed person and may be comprised of more than one

---

[6] *Corbett v. Ohio Bldg. Auth.*, 86 Ohio App.3d 44, 52 (10th Dist.1993).

[7] R.C. 123.281(H)(4)(b) of the bill.

Office of Research and Drafting    LSC    Legislative Budget Office

employee. For example, two jobs employing workers for 20 hours a week each sum to a single FTE job.

The projected FTE jobs in Brook Park are comprised of 870 at the stadium, 2,520 in the adjacent mixed-use district to be constructed, and 1,980 at surrounding businesses. It is likely that the 870 stadium jobs will be mostly, or all, relocated jobs from the Browns' current stadium in Cleveland. Therefore, they should not be considered new jobs, but relocated jobs. To a lesser extent, the same may be said for the projected 2,520 FTE jobs in the mixed-use district. Insomuch as the district pulls demand for the goods and services provided away from Cleveland, some of the newly created positions in the mixed-use district will come at the expense of similar jobs in Cleveland.

The projected 1,980 FTE jobs in surrounding businesses is likely an estimate derived from assumptions on what are called "multiplier effects". Multiplier effects are those derived from the secondary circulation of money that was initially spent due to the new development. That is, some of the additional revenues generated by, for example, a winter concert in the new domed stadium will be used by HSG to purchase local goods or services. This secondary spending may cause the suppliers to the stadium to hire more workers or increase the hours of those already employed.

For example, the stadium may contract with a local promoter to advertise the additional winter concerts, who may, in turn, increase the hours of his employees. Academic literature on the employment of such methods documents frequent misuse of multiplier effects to inflate the reported economic impacts of sport stadiums.[8] However, since the publicly available executive summary does not describe the methods used in detail, LBO is unable to critique the multiplier effects assumed in RCLC's executive summary.

The projected 2,520 indirect and induced jobs in Cuyahoga County are also likely derived from assumed multiplier effects. Indirect jobs refer to those created due to increased demand for the goods and services of suppliers and vendors to the stadium. The example of the promoter increasing the hours of his employees above is an example of an indirect job (or partial FTE job). Induced jobs are estimated in a similar fashion but are based on the spending of increased wages received from the initial job creation. For example, some of the additional income received from employees staffing the winter concerts will be spent locally, perhaps at restaurants. The additional spending at restaurants may necessitate additional waiters and cooks, or more hours worked by those already employed.

Similar to the projected permanent FTE jobs in Brook Park, LBO is unable to critique the assumed multipliers used for the indirect and induced jobs in Cuyahoga County as their values were not provided in the executive summary. RCLC does not include an explanation of how the reported 6,000 temporary construction jobs were projected. Therefore, LBO cannot directly critique the figure as it is not clear how it was constructed or whether it also involves multipliers.

---

[8]Crompton, J. L. (1995). Economic impact analysis of sports facilities and events: Eleven sources of misapplication. *Journal of sport management*, *9*(1), 14-35.

0H385 - W87
Case 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page 33 of 43 PAGEID #: 129
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Jul 31 1:41 PM-25CV005217

Lacking detailed information on how RCLC derived their projections, it is perhaps useful to consider what the academic literature has found on the topic. A recently published peer-reviewed article by three leading sports economists surveyed the literature on the economic impacts of sports stadiums.[9] The authors largely find that the decades of research failed to find significant impacts on employment from the construction of new sports stadiums.

For instance, one surveyed article examined the employment effects of the Colorado Rapids of Major League Soccer leaving Mile High Stadium in Denver (home of the NFL's Denver Broncos) for a newly constructed suburban stadium, similar to what is being proposed by HSG. Neither stadium site was found to have had a significant impact on employment. Note that is not to say that jobs were not relocated from Denver to the suburbs, but rather that the effect was so small that it did not register in the statistical analysis.

Although the literature fails to find an overall positive impact on employment, some studies were identified that found small local positive effects on employment complementary to sports consumption, such as eating and drinking establishments within a mile of the stadium.

## Impact on Economic Growth

RCLC's analysis suggests that the mixed-used development focused around a sports stadium anchor will serve as a catalyst for future economic growth in Cuyahoga County based on several economic studies. Three similar sites are listed as examples of successful projects that spurred further economic growth: (1) The Battery in Atlanta, GA, (2) Titletown in Green Bay, WI, and (3) the Deer District in Milwaukee, WI. The economic studies were not listed in the executive report and so may not be directly evaluated.

However, the academic literature does contain a study on the impact of Major League Baseball's Atlanta Braves moving from the city to the The Battery, which is located in Cobb County, GA. The journal article focuses on commercial assessment values, which should reflect the value of the businesses housed in the properties. The author states,

> Cobb assessment values did not increase relative to other metro-Atlanta counties following the stadiums' announcement or opening, which is inconsistent with the stadium having a positive fiscal impact, even with its desirable location and accompanying mixed-used development. The findings are consistent with past economic studies and are likely generalizable to other stadium projects.[10]

RCLC's executive summary states, "A dome stadium would be additive to attracting different types of major events to Northeast Ohio and generally not competitive to Rocket

---

[9] Bradbury, J. C., Coates, D., & Humphreys, B. R. (2023). The impact of professional sports franchises and venues on local economies: A comprehensive survey. *Journal of Economic Surveys*, *37*(4), 1389-1431.

[10] Bradbury, J. C. (2022). Does hosting a professional sports team benefit the local community? Evidence from property assessments. *Economics of Governance*, *23*(3), 219-252.

Case 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page 34 of 43 PAGEID #: 130
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Sep 31 6:44:28AM-00

Office of Research and Drafting | LSC | Legislative Budget Office

Mortgage Field House". [11] On the same page, the report states, "data shows that events are a substitute for travel and entertainment." These two statements are contradictory. Economic theory agrees with the latter: entertainment options at venues such as Rocket Mortgage Arena would be substitutes for those at a new Brook Park site. For example, an individual cannot attend a Taylor Swift concert at the proposed domed stadium and a Cleveland Cavaliers game at Mortgage Arena simultaneously. Even if the events are held on different days, the consumer has a limited budget and may not be able to afford both.

## Impact on Economic Activity

RCLC projects $11 million in additional spending at bars, restaurants, and hotels in downtown Cleveland due to the proposed Brook Park mixed-use development. The authors claim that the stadium will attract an additional 1.5 million visitors, many of whom are assumed to stay in downtown Cleveland after visiting Brook Park. The report also states that 40% of visitors to Huntington Bank Field in 2024 were from out-of-state and that 65% to 75% of visitors at events similar to those held at domed stadiums were from out-of-state. Comments made by Chief Administrative Officer and General Counsel of HSG, Ted Tywang, at the House Arts, Athletics, and Tourism Committee meeting on March 11, 2025 imply that these statistics are derived from ticket sales and are likely accurate.[12] The implication is that a domed stadium in Brook Park would allow for more events that would attract crowds comprised mostly out-of-state visitors.

According to the Venues Design Director at HKS, the Texas-based architecture firm employed by HSG, the proposed stadium in Brook Park will have a capacity up to 70,000 visitors, approximately 3,000 more than Huntington Bank Field. Given the stated average 10 games per season played at home by the Browns, the new stadium would allow for approximately 30,000 more visitors for NFL games.[13] This leaves 1.47 million of the additional visitors to be explained by additional events held at the stadium, equivalent to exactly 21 sold-out events. According to the attached study by Econsults, none of the three closest domes had more than 12 major events (attendance of at least 50,000) in 2023.[14]

The authors also found that the three comparison domes hosted between four to 10 smaller events, such as high school tournaments, conventions, and motocross, but did not list an average attendance of these events. If we instead assume that smaller events at the new Brook Park stadium occupy 50% of the stadium capacity (i.e., 35,000 visitors), and 10 smaller events are

---

[11] RCLCO Real Estate Consulting. (2024) *(Executive Summary) Market Feasibility and Fiscal/Economic Impact.* static.clubs.nfl.com.pdf.

[12] ohiochannel.org/video/ohio-house-arts-athletics-and-tourism-committee-3-11-2025.

[13] With a 17-game schedule, each NFL team hosts eight or nine home games per season. The 10-game average may include assumed playoff appearances or preseason games. It is more likely that preseason games, which may be one or two per season, is included in the figure as the Browns have not had a home playoff game since 1995.

[14] Ford Field in Detroit is reported to have hosted 12 major concerts or events, U.S. Bank Stadium in Minneapolis was reported to have had six such events, and Lucas Oil Stadium in Indianapolis was reported to have had four.

0H385 – W89
Case 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page 35 of 43 PAGEID #: 131
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Sep 05 11:26 PM-25CV006817

held in addition to 12 sold-out major events with 70,000 visitors – all of which would not occur in any other Ohio stadium otherwise – and that the additional stadium capacity compared to Huntington Bank (3,000) is fully utilized for every Browns game, the Brook Park stadium would only attract 1.22 million new visitors, not 1.5 million.[15] It is important to emphasize that this calculation assumes an optimistic scenario relative to the experiences in comparable cities, suggesting that the estimated 1.5 million new visitors may be overly optimistic.

RCLC's report does not consider how many of these additional events will be relocated from other in-state stadiums. For example, Major League Soccer's Columbus Crew, who are also owned and operated by HSG, relocated their home game against Inter Miami this season to Huntington Bank Field. The purpose of the move was to capitalize on the increased demand to watch Inter Miami's Lionel Messi, widely considered to be the greatest soccer player of all time. The increase in economic activity in Cleveland was therefore created at the cost of revenue that would otherwise have been generated in Columbus. It is likely that future matches where Columbus play teams with international stars will be relocated to the proposed stadium in Brook Park, thereby relocating economic activity away from Columbus.

### Impact on Cleveland

RCLC cites a projected $10 million loss in tax revenue to Cleveland and mention the necessity to consider the city's cost savings on annual debt service, maintenance, capital repairs, insurance, and other gameday operating costs it is required to pay for under the lease agreement with the Browns. However, since the city owns the building and land, it will likely continue to incur maintenance, repair, and insurance costs unless the building is demolished, which would also incur a substantial cost.

The source of the $10 million figure reported by RCLC was not listed, so LBO is unable to evaluate this claim. The attached study carried out by Econsult reports a projected $11 million cost in lost tax revenue for the city. However, many of the criticisms of the RCLC study may also apply to that analysis as the figure is comprised of direct, indirect, and induced tax revenue.

### Conclusion

The academic literature on publicly funded sports stadiums is vast, covering many decades, sports, states, and municipalities. The overwhelming conclusion from this body of research is that there are little to no tangible impacts of sports teams and facilities on local economic activity. A second conclusion is that the level of government subsidies given for the construction of facilities far exceeds any observed economic benefits when they do exist. RCLC's executive summary contains claims that contradict these widely known research findings, but LBO cannot verify RCLC's claims because the source material and methodology were not documented in full detail.

Of final note, RCLC's executive summary cautions against using its projections for the purpose of financing the stadium. The final paragraph states,

---

[15] $(35,000 \times 10) + (70,000 \times 12) + (3,000 \times 10) = 1,220,000.$

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 36 of 43 PAGEID #: 132
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 07 3:16 PM-25CV005715

| Office of Research and Drafting | LSC | Legislative Budget Office |
|---|---|---|

This report is not to be used in conjunction with any public or private offering of securities or other similar purpose where it may be relied upon to any degree by any person other than the client without first obtaining the prior written consent of RCLCO.

## Further Questions

Please let us know if you have any more questions. If you seek further information about the bond issuance or constitutional aspect, you may reach ████████████████████ ████████████████. If you have further questions about the economic impact commissioned by the HSG, please contact ████████████████████████████████.

Attachments:  R_136_1110 Econsult.pdf
              R_136_1110 RCLC.pdf
              R_136_1110 slideshow.pdf

R-136-1110/jw

Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Aug 07 3:19 PM-25CV005715
0H385 - W91

# EXHIBIT B

Case: 2:25-cv-01140-ALM-EPD Doc #: 3-1 Filed: 10/06/25 Page: 38 of 43 PAGEID #: 134
Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Jul 31 1:14 PM-25CV005915

0H385 - W92



Administration
Office 614-728-5458
Fax 614-466-5087

June 27, 2025

The Honorable Mike DeWine
Governor of the State of Ohio
77 S. High St., 30th Fl.
Columbus, OH 43215

Re: Browns Brook Park Stadium Project and Unclaimed Funds Escheatment
Language in House Bill (HB) 96

Dear Governor DeWine:

I am writing to urge you to exercise your line-item veto authority on language that
would escheat taxpayer dollars toward sports stadium construction projects
statewide.

As you are aware, the legislature has proposed the establishment of a statutory right
for the state to escheat existing unclaimed funds that are at least 10 years old as of
January 1st, 2026. This timeline makes Ohio an outlier nationally and risks
inadvertently harming taxpayers unaware they have money in the state's unclaimed
funds.

All 50 states have enacted some form of unclaimed property law.[1] "Although one
purpose of such acts is to protect the missing owners, the primary rationale behind
this legislation is its use as a revenue raising device."[2] Generally, those laws ensure
that "the state receives the use of the property as well as any income that it may
provide" until there is a valid "a claim by the missing owner."[3]

But just because some states use unclaimed property for revenue, cutting off property
rights definitively after 10 years would deviate from the norm. As one commentator
described the general rule, state unclaimed property "statutes require the return of
the property (or its value, if it was sold) to the owner on demand, regardless of how
much time has elapsed."[4] Indeed, the Uniform Unclaimed Property Act ensures that

---

[1] *See What is Unclaimed Property?*, Nat'l Ass'n Unclaimed Prop. Administrators,
http://www.unclaimed.org/what/ (last visited June 27, 2025).
[2] *Louisiana Health Serv. & Indem. Co. v. McNamara*, 561 So. 2d 712, 716 (La. 1990).
[3] *Ibid*.
[4] John V. Orth, *Escheat: Is state the last heir?* 13 Green Bag 2d 73, 80 (2009).

the rightful owner of property can always state their claim. As the comment to Section 16 of the 1995 version of that model legislation explains, "The owner's rights are never cut off; under this Act, the owner's rights exist in perpetuity."[5] The comments to the 2016 version of the Uniform Unclaimed Property Act, which then states have enacted, are even clearer; under that model legislation, "states are not entitled to use these funds, without ensuring that the funds will be available to apparent owners if and when they come to claim them."[6]

Even states that have not adopted the Uniform Unclaimed Property Act make clear that the state must pay a rightful claim. For example, consider Pennsylvania's law, which directs unclaimed funds be used to pay the victims of crime, but also makes clear that "[n]otwithstanding any other provision of this subsection, the State Treasurer shall make reimbursements and prompt payment of claims for funds received."[7]

The proposal in the budget is quite different from this mainstream principle. It not only uses unclaimed funds for public benefit in the interim until a claim is made, but fully cuts off claims after 10 years, starting in 2036.[8]

While I appreciate funding was provided to the Department of Commerce to advertise these funds, I remain concerned that many Ohioans—some still unaware they are entitled to **their** monies—will lose out due to this change. The statutory taking of public funds without clear public benefit is poor policy.

Billionaires should finance their own stadiums—full stop. The $600 million handout for a single professional sports facility raises serious concerns about fiscal sustainability and fairness. While public-private partnerships can sometimes support community development, this provision risks prioritizing one private entity over more urgent statewide needs—such as lowering childcare costs to boost workforce participation or easing the property tax burdens that weigh heavily on **every** Ohio homeowner. Most Ohioans will never set foot in the proposed Brook Park stadium or similar venues—whether due to lack of interest, team affiliation, or the unaffordable cost of attending professional sporting events. Too often, Ohio taxpayers are left on the sidelines while the wealthiest score with public money.

Moreover, what about Ohio's other major sports teams? As the saying goes, if you give a mouse a cookie, they'll want a glass of milk—public money is not the milk.

---

[5] Comment, Unif.Unclaimed Property Act 1995 §16.

[6] Comment, Unif.Unclaimed Property Act 2016 §804.

[7] 72 Pa. Stat. Ann. §1301.18(a)(6).

[8] *See* HB96, Section 169.08(I)).

While the proposed Cultural and Sports Facility Performance Grant Fund aims to cover all venues, how can we be certain it will remain solvent for years to come? What happens when the Guardians and Reds seek similar funding to replace aging stadiums? And what occurs when the unclaimed funds well inevitably runs dry?

This is an opportunity to pause and reconsider the best way to support economic development while maintaining public trust. A thoughtful pause now would allow policymakers to explore options that are more fiscally responsible and beneficial to the 11.9 million Ohioans you and I serve.

I continue to appreciate your leadership on behalf of the State of Ohio and appreciate your consideration of my request.

Yours,

Dave Yost
Ohio Attorney General

0H385 - W95

## VERIFICATION

I, ALLEN SKIERSKI being first duly sworn according to law, hereby verify and state that I am a Plaintiff in the foregoing Complaint; that I have read the Complaint and the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

Executed on this 7th day of July, 2025.

_____
ALLEN SKIERSKI

State of OHIO            )
                         )
County of CUYAHOGA       )

Sworn to and subscribed before me this 7th day of July, 2025, by ALLEN SKIERSKI.

Notary Public: _____

My Commission Expires: _____

Jeffrey A. Crossman, Atty.
NOTARY PUBLIC - STATE OF OHIO
My commission has no expiration date
O.R.C. §147.03

## VERIFICATION

I, MARY BLEICK being first duly sworn according to law, hereby verify and state that I am a Plaintiff in the foregoing Complaint; that I have read the Complaint and the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

Executed on this 7 day of July, 2025.

_Mary Bleick_
MARY BLEICK

State of OHIO          )
                           )
County of CUYAHOGA   )

Sworn to and subscribed before me this 7 day of July, 2025, by MARY BLEICK.

Notary Public: _____

Jeffrey A. Crossman, Atty.
NOTARY PUBLIC - STATE OF OHIO
My commission has no expiration date
O.R.C.§147.03

My Commission Expires: _No expiration_

## VERIFICATION

    I, TODD BUTLER being first duly sworn according to law, hereby verify and state that I am a Plaintiff in the foregoing Complaint; that I have read the Complaint and the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

Executed on this 7 day of July, 2025.


_____
TODD BUTLER


State of OHIO         )
                        )
County of CUYAHOGA   )


    Sworn to and subscribed before me this 7 day of July, 2025, by TODD BUTLER.


Notary Public: _____

My Commission Expires: ____no expiration____

Jeffrey A. Crossman, Atty.
NOTARY PUBLIC - STATE OF OHIO
My commission has no expiration date
O.R.C. §147.03