## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

|  |  |  |
|---|---|---|
| MARY BLEICK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 25CV005715 |
| | ) | |
| v. | ) | Judge David C. Young |
| | ) | |
| SHERYL MAXFIELD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO DISMISS
### (Oral Hearing Requested)

Pursuant to Ohio Rules of Civil Procedure 12(B)(1) and 12(B)(6), Defendants Sheryl Maxfield (in her official capacity as Director of the Ohio Department of Commerce), Akil Hardy (in his official capacity as Superintendent of the Ohio Division of Unclaimed Funds), Robert Sprague (in his official capacity as Ohio Treasurer), and Joy Bledsoe (in her official capacity as Executive Director of the Ohio Facilities Construction Commission) move to dismiss Plaintiffs' Complaint in its entirety with prejudice.

Pursuant to Local Rule 21.01, Defendants respectfully request an oral hearing on this Motion.

A Memorandum in Support is attached.

Respectfully submitted,

*/s/ Aneca E. Lasley*
Aneca E. Lasley (0072366) (Trial Attorney)
Andrea E. Howell (0101138)
ICE MILLER LLP
250 West Street, Suite 700
Columbus, Ohio 43215
Tel:  (614) 462-2700/Fax:  (614) 462-5135
Aneca.Lasley@icemiller.com
Andrea.Howell@icemiller.com

Joshua Klarfeld (0079833)
ICE MILLER LLP
600 Superior Ave East, Suite 1300
Cleveland, OH 44114
Tel:  (216) 394-5063
Joshua.Klarfeld@icemiller.com

John D. French (#37629-53)
*(Pro Hac Vice pending)*
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282
Tel:  (317) 236-2100/Fax:  (317)-236-2219
JD.French@icemiller.com

*Special Counsel for Defendants Sheryl
Maxfield (in her official capacity as Director
of the Ohio Department of Commerce), Akil
Hardy (in his official capacity as
Superintendent of the Ohio Division of
Unclaimed Funds), Robert Sprague (in his
official capacity as Ohio Treasurer), and Joy
Bledsoe (in her official capacity as Executive
Director of the Ohio Facilities Construction
Commission)*

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| MARY BLEICK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 25CV005715 |
| | ) | |
| v. | ) | Judge David C. Young |
| | ) | |
| SHERYL MAXFIELD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

Plaintiffs' Complaint raises misguided challenges to portions of H.B. 96, including those codified into Revised Code Chapter 169, that authorize the State to take title to certain abandoned property that has been unclaimed for at least 15 years. Plaintiffs allege that the statute authorizes an unconstitutional taking of property. Their conspiratorial ramblings aside, Plaintiffs articulate their belief that Ohio's law is as novel as it is objectionable—a new, alarming intrusion on individual property rights.

In reality, the law is both mundane and entirely within the State's prerogative. The State's right to manage, dispose of, and take title to abandoned property has been established for hundreds of years. The United States Supreme Court has repeatedly affirmed a state's right not only to take custody and hold abandoned property for the benefit of property owners, but also to, after a period time, take title to that property. Ohio's statute is nothing new; its constitutionality is well-established.

Setting aside the merits deficiencies, the Complaint suffers from numerous other infirmities. Chief among them is Plaintiffs' inexplicable decision to ignore an administrative process through which they can claim their funds—one available to them even now. Rather than

1

use that simple, free, and accessible procedure, they come before this Court seeking redress for a self-inflicted wound. Accordingly, they have failed to exhaust their administrative remedies. They also lack standing, their claims are not ripe, and they have an adequate remedy at law that bars equitable relief.

The Complaint is nothing more than an expression of Plaintiffs' belief that the law makes for bad public policy. Plaintiffs, however, are not entitled to use this lawsuit to substitute their judgment for that of the State's duly elected representatives. Legislative enactments, products of the democratic process, are not so easily set aside at the whims of excitable plaintiffs.

The Court lacks subject matter jurisdiction over Plaintiffs' claims, and the Complaint fails to state a claim for which relief can be granted. Defendants are entitled to a dismissal with prejudice.

## II.  FACTS AND BACKGROUND

### A.  OHIO'S UNCLAIMED FUNDS STATUTE

Ohio's Unclaimed Funds Statute—R.C. 169.01 *et seq.*—provides that certain unclaimed funds are to be deposited and held in Ohio's Unclaimed Funds Trust Fund (the "UFTF"). The Ohio Department of Commerce, Division of Unclaimed Funds (the "Division") is charged with implementing the statute and maintaining the UFTF. R.C. 169.05; *Avaya Inc. v. Ohio Dep't of Commerce, Div. of Unclaimed Property*, 2021-Ohio-4626, ¶ 2 (10th Dist.). Property deposited into the UFTF includes certain bank account funds, certificates of deposit, and insurance proceeds that have been unclaimed for at least five years. R.C. 169.02. Holders of unclaimed funds, like financial institutions, are required to make an unclaimed funds report to the Division each year. R.C. 169.03. For unclaimed property with a value of $50 or more, the holder must report the full name and last known address of the owner; the nature, identifiers, and description of the funds; the date when the funds become payable; and the owner's social security number. R.C. 169.03(A)(2).

The Statute contains robust notice requirements. Before filing the unclaimed funds report, each holder must "send notice to each owner of each item of unclaimed funds having a value of fifty dollars or more at the last known address of the owner as shown by the records of the holder." R.C. 169.03(E). That notice must:

> [1] set forth the nature and identifying number, if any, or description of the funds and the amount appearing on the records of the holder to be due the owner or beneficiary, and [2] shall inform the owner or beneficiary that the funds will, thirty days after the mailing of the notice, be reported as unclaimed funds under this chapter. [3] A self-addressed, stamped envelope shall be included with the notice, with instructions that the owner or beneficiary may use the envelope to inform the holder of the owner's or beneficiary's continued interest in the funds, and, if so informed before the date for making the report to the director, the holder shall not report the funds to the director. [4] The notice shall be mailed by [a] first class mail if the item of unclaimed funds has a value of fifty dollars or more but less than one thousand dollars and by [b] certified mail, return receipt requested, if the item of unclaimed funds has a value of one thousand dollars or more, unless the holder has verified that the last known address of the owner or beneficiary as shown by the records of the holder is not accurate.

*Id*. Additionally, the Division retains the right to—and does—audit holders of unclaimed property to confirm their compliance with R.C. 169. *See* R.C. 169.03(G).

**B.      H.B. 96 AMENDS THE UNCLAIMED FUNDS STATUTE**

On June 30, 2025, the Governor signed H.B. 96, Ohio's biennial budget bill. As relevant to this lawsuit, H.B. 96 made changes to the Unclaimed Funds Statute at Revised Code Chapter 169 to provide that funds held in the UFTF for ten years or more escheat to the State and are deemed abandoned by operation of law. Under the amended statute:

- Funds deposited before January 1, 2016 will escheat on January 1, 2026. R.C. 169.08(I)(1) (as amended by H.B. 96).

- Funds deposited after January 1, 2016 will escheat after ten years—unless, of course, they are claimed at any time during that ten-year period. R.C. 169.09(I)(2).

- Claimants still may recover escheated funds until January 1, 2036 by filing a valid claim. R.C. 169.08(I)(3)(b).

The Statute also directs that escheated funds be transferred to the Ohio Cultural and Sports Facility Performance Grant Fund created under R.C. 123.282. R.C. 169.08(I)(4). The amended statute retains all previously enacted notice provisions. *See generally* R.C. 169.01 *et seq.*

## C. DEFENDANTS' ROLES IN ADMINISTRATION OF THE UFTF

Sheryl Maxfield is Ohio's Director of Commerce. Compl. ¶ 54. Akil Hardy is the Superintendent of the Division, which sits inside the Department of Commerce. *Id.* ¶ 55. Robert Sprague is the Ohio State Treasurer, *id.* ¶ 56—an office that has no duties related to the escheat or the challenged appropriations provisions of the Statute or H.B. 96. Joy Bledsoe serves as the Executive Director for the Ohio Facilities Construction Commission, *id.* ¶ 57—a Commission that has no role in administering the UFTF or the newly created Ohio Cultural and Sports Facility Performance Grant Fund created by newly enacted R.C. 123.282 as part of H.B. 96.

The amendment to R.C. 169.08(I) (as amended in H.B. 96) and R.C. 123.282 (as enacted in H.B. 96), respectively set out the ongoing process of escheatment from the UFTF and remittance of funds to the newly created Ohio Cultural and Sports Facility Performance Grant Fund. Section 229.40 of H.B. 96 further directs the "Director of Commerce" to remit certain escheated funds "for deposit into the Ohio Cultural and Sports Facility Performance Grant Fund." The remaining portion of the unclaimed funds that escheat to the State on January 1, 2026, "shall be deposited into the Ohio Escheatment Fund, which is hereby created in the state treasury." *Id.* Funds that escheat thereafter "shall be deposited into the Ohio Cultural and Sports Facility Performance Grant Fund." *Id.* Finally, Section 229.40 makes an appropriation for funds to be used for the construction of a new stadium in Brook Park:

> There is hereby appropriated $1,000,000,000 in fiscal year 2026 to appropriation item 042428, Cultural, Sports, and Major Sports Facilities Performance Grants, from revenues received in the Ohio Cultural and Sports Facility Performance Grant Fund . . . The Office of Budget and Management shall use $600,000,000 from appropriation item 042428, Cultural, Sports, and Major Sports Facilities

Performance Grants, to support construction of a transformational major sports facility mixed-use project pursuant to section 123.281 of the Revised Code that is associated with a Brook Park economic development project . . . .

*Id.*

### D.    PLAINTIFFS' CHALLENGES TO THE AMENDED STATUTE

Plaintiffs claim they are Ohio residents and the "rightful owners of property currently held in trust by the State of Ohio pursuant to Ohio Revised Code Chapter 169 in an account otherwise known as the [UFTF].'" Compl. ¶ 6. They allege they have "confirmed" that "the State is currently holding property to which they are entitled, either as original owners or heirs of the original owners." *Id.* ¶ 8. Plaintiffs claim that Ohioans must now "'race the clock' in an attempt to recover their property or the property they are entitled to as heirs of the original property owner, fundamentally altering the property rights of Ohioans and other with claims to property in the [UFTF]." *Id.* ¶ 21.

The Complaint attempts to set out eight counts. Plaintiffs bring Counts I and II under 42 U.S.C. § 1983, claiming that the amended statute permitting unclaimed funds to be escheated violates the Takings Clause of the U.S. Constitution (Count I, Compl. ¶¶ 85-92) and the Due Process Clause of the Fourteenth Amendment (Count II, Compl. ¶¶ 93-98). In Count III, Plaintiffs claim that the escheat provisions of the amended statute violate Article I, Section 19 of the Ohio Constitution. *Id.* ¶ 99-110. In Count IV, they claim the amended statute violates "the State's fiduciary duty to the Plaintiffs and the class." *Id.* ¶ 114. In Count V, they allege that H.B. 96 violates the "single subject rule" in Article II, Section 15(D) of the Ohio Constitution. *Id.* ¶¶ 115-21. In Counts VI and VII, Plaintiffs allege they are entitled to injunctive relief and a writ of mandamus, respectively. *Id.* ¶¶ 122-39. Finally, in Count VIII, Plaintiffs allege that passage of H.B. 96 impermissibly exceeded the bounds of the Legislature's authority. *Id.* ¶¶ 140-46.

The Complaint seeks relief in a variety of forms, including declaratory judgment, prohibitive and affirmative injunctive relief, and a writ of mandamus. Plaintiffs also seek to have this case proceed as a class action.[1] Nonetheless, as explained below, their claims all fail on the face of the Complaint and should be dismissed with prejudice.

## III.    ARGUMENT

### A.    MOTION TO DISMISS STANDARD

Civ.R. 12(B)(1) allows parties to move for dismissal based on "lack of jurisdiction over the subject matter." "When presented with a motion to dismiss for lack of subject matter jurisdiction pursuant to Civ.R. 12(B)(1), a trial court must determine 'whether any cause of action cognizable by the forum has been raised in the complaint.'" *TLC Health Care Servs., LLC v. Ohio Dep't of Job & Fam. Servs.*, 2017-Ohio-9198, ¶ 8 (10th Dist.) (quoting *Interim HealthCare of Columbus, Inc. v. Ohio Dept. of Adm. Servs.*, 2008-Ohio-2286, ¶ 7 (10th Dist.)).

In reviewing a motion to dismiss under Civ.R. 12(B)(6), a court presumes all factual allegations in the complaint are true, and all reasonable inferences must be made in favor of the nonmoving party. *State ex rel. Seikbert v. Wilkinson*, 69 Ohio St.3d 489, 490 (1994) (citing *Perez v. Cleveland*, 66 Ohio St.3d 397, 399 (1993)). Nonetheless, "unsupported conclusions of a complaint are not considered admitted and are not sufficient to withstand a motion to dismiss." *Id.* (citing *State ex rel. Hickman v. Capots*, 45 Ohio St.3d 324 (1989)).

---

[1] Consistent with the Court's August 15, 2025 Order, Defendants are filing a separate Motion to Strike Class Allegations contemporaneously with this Motion to Dismiss. In the event the Court grants this Motion, it would obviate the need to take up the Motion to Strike.

**B.      PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE THEY HAVE FAILED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES.**

### 1.      There Is a Straightforward Administrative Process to Claim Funds Held in the UFTF.

Ohio has a clear and accessible administrative process for individuals to claim unclaimed funds held in the UFTF. When claimants believe they have property in the UFTF, they may file a claim with the Division, including through a public website maintained by the Division. R.C. 169.08; Adm.Code 1301:10-4-01(A).[2] The Division evaluates the claim and can consider evidence and subpoena witnesses and documents as necessary. R.C. 169.08(B); Adm.Code 1301:10-4-01(B). A hearing on the claim must be held if the claimant requests one. R.C. 169.08(B); Adm.Code 1301:10-4-01(B); Adm.Code 1301:10-2-02. From there, the Division decides the claim, and that decision is subject to appeal. Adm.Code 1301:10-2-02.

The administrative procedure is readily available and free. Everything needed to file a claim is maintained on the Division's website. The Division also maintains free resources, like frequently asked questions and informational videos, to educate the public on retrieving unclaimed funds.[3] Plaintiffs offer no complaints about the administrative process. They also have not alleged (nor can they) that the available administrative remedies are insufficient to make them whole.

---

[2] *See also* Ohio Department of Commerce Division of Unclaimed Funds, *Ohio Unclaimed Funds – Claim Your Lost Money*, https://com.ohio.gov/divisions-and-programs/unclaimed-funds (accessed Aug. 16, 2025).

[3] Ohio Department of Commerce Division of Unclaimed Funds, *What Are Unclaimed Funds* https://com.ohio.gov/divisions-and-programs/unclaimed-funds/about-unclaimed-funds (accessed Aug. 16, 2025). The Court is permitted to take judicial notice of government websites. *See, e.g.*, *State ex rel. Banker's Choice, LLC v. Cincinnati*, 2020-Ohio-6864, ¶ 7-8 (1st Dist.) (citing Evid. R. 201(E)) ("While generally limited to the allegations stated in a complaint, a trial court may take judicial notice of 'appropriate matters' . . . A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) ("Public records and government documents are generally considered 'not to be subject to reasonable dispute.' This includes public records and government documents available from reliable sources on the Internet."); *Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 903 (N.D. Ill. 2002) (taking judicial notice of stock prices posted on a website); *Cali v. E. Coast Aviation Servs., Ltd.*, 178 F. Supp. 2d 276, 287 (E.D.N.Y. 2001) (taking judicial notice of documents from state and federal agencies).

### 2.     Plaintiffs' Failure to Exhaust Their Administrative Remedies Bars Their Claims.

Plaintiffs could have followed the administrative process and, had they done so, they would have no funds that would ever be subject to escheat or otherwise implicated by the amendments to the Statute. Additionally, Plaintiffs can still proceed right now in accord with the law and administrative remedies available to them to make claim to their purported property. Plaintiffs have decided to willfully ignore their readily available, statutorily prescribed remedies, opting instead to present the Court with a problem of their own creation. Without any basis to claim that their administrative remedies are unavailable or burdensome, Plaintiffs were required to resolve their claims through the administrative process before bringing suit.

"The exhaustion of administrative remedies doctrine is a well-established principle of Ohio law." *Waliga v. Coventry Twp.*, 2004-Ohio-5683, ¶ 12 (9th Dist.) (citing *Noernberg v. Brook Park*, 63 Ohio St.2d 26, 29 (1980) and *State ex rel. Lieux v. Westlake*, 154 Ohio St. 412, 415-16 (1951)). Specifically, "the doctrine requires that a party exhaust available administrative remedies prior to seeking court action in an administrative matter." *Id.* (citing *Noernberg*, 63 Ohio St.2d at 29-30). Plaintiffs are relieved of the exhaustion requirement only when (1) exhaustion would be futile or (2) the remedy would be onerous or unusually expensive. *Id.* And a litigant bringing a constitutional challenge must still exhaust administrative remedies even though the administrative body would not have the ability to hear a litigant's constitutional challenge. *Id.* at ¶¶ 16-18.[4]

---

[4] Although not a jurisdictional requirement, the Ohio Supreme Court has held that exhaustion of administrative remedies is an affirmative defense that may be raised in a 12(B)(6) motion when apparent on the face of the complaint. *Mankins v. Paxton*, 142 Ohio App.3d 1, 9 (10th Dist. 2001). The failure to exhaust administrative remedies appears on the face of the complaint when, as here, the administrative appeals process is set forth in statute. *See id.* ("As to appellant's eighth claim, the face of the complaint indicates that appellant did have an adequate administrative remedy…by way of the appeals process set forth in R.C. 5101.35. Therefore, the trial court properly dismissed the eighth claim for relief as to the state defendants.").

In *Driscoll v. Austintown Associates*, 42 Ohio St.2d 263 (1975), one of the seminal cases on exhaustion, the Ohio Supreme Court considered a plaintiff's challenge to an ordinance that prohibited the construction of multi-family dwelling units on a parcel he owned. *Id.* at 266. The Court held that the plaintiff was required to exhaust his administrative remedies—seeking a zoning variance—before bringing a constitutional challenge in the trial court. *Id.* at 274. The Court noted that the Ohio Supreme Court "has previously indicated that prior to initiating a declaratory judgment action attacking the constitutionality of a zoning ordinance as applied to his property, the owner normally must exhaust any administrative remedy that could provide him with the relief he seeks." *Id.* at 273.

*Driscoll* relied heavily on *Lieux v. Westlake*, in which the Ohio Supreme Court explained the rationale behind the exhaustion requirement in the context of a constitutional challenge seeking mandamus relief:

> It is a fundamental principle of law that constitutional questions will not be decided until the necessity for their decision arises. *State ex rel. Herbert v. Ferguson, Aud.*, 142 Ohio St. 496, 52 N.E.2d 980; *Village of Strongsville v. McPhee*, 142 Ohio St. 534, 53 N.E.2d 522; *Rucker v. State*, 119 Ohio St. 189, 162 N.E. 802. In the instant case, if the relator had followed the administrative remedy provided for in the ordinance, the village Board of Appeals might have given her a special permit. If such special permit were given to relator, then relator would not be prejudiced by the zoning ordinance which she seeks to have declared unconstitutional. Whether it will ever be necessary for this court to consider the constitutionality of this zoning ordinance, in order to determine relator's right to a building permit, cannot be determined until relator has exhausted the administrative remedies provided for by that ordinance.

*Lieux*, 154 Ohio St. 412 at 415-16 (cleaned up).

Over the decades since *Lieux* and *Driscoll*, their holdings have been affirmed time and time again in various administrative contexts. *See, e.g.*, *Jones v. Chagrin Falls*, 77 Ohio St.3d 456, 459 (1997) (endorsing *Driscoll*); *Karches v. City of Cincinnati*, 38 Ohio St.3d 12, 17 (1988) (discussing *Driscoll* and the exhaustion requirement); *Walker v. City of Toledo*, 2017-Ohio-416, ¶¶ 2, 5, 7, 35

(6th Dist.) (rejecting putative class action constitutional challenge to automated traffic law enforcement system where named plaintiff had failed to exhaust administrative remedies set forth in traffic law); *Accent Grp., Inc. v. N. Randall*, 2005-Ohio-5345, ¶¶ 10-15 (8th Dist.) (requiring exhaustion before constitutional challenge could be brought); *Waliga*, 2004-Ohio-5683, at ¶¶ 17-19 (affirming dismissal of constitutional challenges to an ordinance for failing to exhaust administrative remedies); *Mankins* at 5 (42 U.S.C. § 1983 action). Most recently, the Ohio Supreme Court reaffirmed the principle that "even though administrative agencies cannot adjudicate constitutional questions . . . a party cannot circumvent the administrative-review process by first raising a constitutional challenge in the common pleas court." *Pivonka v. Corcoran*, 2020-Ohio-3476, ¶ 24. Rather, "***the proper procedure for raising a constitutional challenge is to first exhaust all administrative remedies***." *Id.* (emphasis added).

Under *Lieux*, *Driscoll*, and their progeny, because Plaintiffs' alleged injury is one for which an administrative remedy is available, they were required to exhaust that remedy before bringing this lawsuit.

Applying the exhaustion requirement here will not leave Plaintiffs without recourse. Plaintiffs claim they have been injured by the amendment to the Statute because, at some point, their unclaimed property will escheat to the State. Rather than bringing this lawsuit, Plaintiffs were required to (and, indeed, still can) avail themselves of the codified procedure to claim their money, relieving this Court of having to wade into their premature challenges to the amended statute. The exhaustion mandate is particularly appropriate here, where Plaintiffs have raised constitutional claims: "It is a fundamental principle of law that constitutional questions will not be decided until the necessity for their decision arises." *Lieux* at 415 (citations omitted). Plaintiffs cannot proceed in court unless and until they exhaust their administrative remedies.

## C.     PLAINTIFFS LACK AN ACTUAL, IMMINENT INJURY SUFFICIENT TO ESTABLISH STANDING.

The Ohio Supreme Court has repeatedly recognized that the "Ohio Constitution expressly requires standing for cases filed in common pleas courts." *Preterm-Cleveland, Inc. v. Kasich*, 2018-Ohio-441, ¶ 20 (quoting *ProgressOhio.org, Inc. v. JobsOhio*, 2014-Ohio-2382, ¶ 11). The Constitution provides that the courts of common pleas have original jurisdiction over all justiciable matters, but a "matter is justiciable only if the complaining party has standing to sue." *Id.*

To attack a statute's constitutionality, a plaintiff "must generally show that he or she has suffered or is threatened with direct and concrete injury in a manner or degree different from that suffered by the public in general, that the law in question has caused the injury, and that the relief requested will redress the injury." *Id.* at ¶ 21 (quoting *Ohio Trucking Ass'n v. Charles*, 2012-Ohio-5679, ¶ 5). These constitutional standing requirements cannot be bypassed simply because plaintiffs allege that their claims are of great public importance. *See State ex rel. Martens v. Findlay Municipal Ct.*, 2024-Ohio-5667, ¶¶ 19-20 (expressly overruling the "public-right-doctrine" purported exception to standing as stated in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451 (1998)).

Plaintiffs lack standing here for two reasons. First, Plaintiffs cannot self-inflict an injury to obtain standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) ("self-inflicted injuries" did not give plaintiffs standing); *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) ("[Plaintiff's] alleged injury looks like a self-inflicted injury, in which case he lacks standing to sue[.]") (collecting cases). That principle derives from the causation requirement: if plaintiffs' own conduct caused their injuries, it cannot be said that "the law in question has caused the injury." *See Preterm-Cleveland* at ¶ 21. Plaintiffs here simply ignored (and continue to ignore) the available

administrative procedure entirely. By deciding not to file claims under that process, they plan to cause their own injury and lack standing to claim that Defendants are at fault.

Second, Plaintiffs lack an actual, imminent, and concrete injury. Plaintiffs allege that they each are "rightful owners of property" held in the UFTF. Compl. ¶¶ 6-8. They have not alleged how long their property has been in the UFTF nor where the property came from, much less that they are unable to make a claim to recover that property right now. Under the amended statute, if property has already been unclaimed for ten years, it will escheat to the State on January 1, 2026. R.C. 169.08(I)(1). For funds that have been in the UFTF for less than ten years, those funds "are deemed abandoned and escheat to the state [after ten years only] if no valid claim is filed by the owner." R.C. 169.08(I)(2). Those provisions notwithstanding, the amended statute even allows claimants to recover the value of their abandoned property *until January 1, 2036*:

> (b) Notwithstanding division (I)(3)(a) of this section, the former owner or other person claiming a property interest in unclaimed funds that are deemed abandoned and escheat to the state *may file a claim for payment of an equivalent amount, together with interest earned by the state if required under division (D) of this section, at any time on or before January 1, 2036*. Upon providing sufficient proof of the validity of the owner's or other person's claim, the director shall pay the claim less any expenses and costs incurred by the state in securing full title and ownership of the unclaimed funds.

R.C. 169.08(I)(3)(b) (emphasis added). Thus, no matter what, Plaintiffs have had and will have *more than ten years* until they could theoretically experience a loss of their property—that is hardly "imminent."[5]

---

[5] The amended statute may not even affect Plaintiffs' rights at all. If their unclaimed funds are in the form of unclaimed deposits from a failed bank that have been in the UFTF for more than 10 years, federal law already prescribes that those funds belong to the Federal Deposit Insurance Corporation ("FDIC"). When the FDIC acts as a receiver over a financial institution, it gives depositors notice and up to 18 months to claim their deposits. 12 U.S.C. § 1822(e). After 18 months, the FDIC delivers the unclaimed funds to a state's unclaimed property division. § 1822(e)(2). If the depositor still does not claim the funds within ten years, the money becomes the FDIC's property. § 1822(e)(5). So, even if H.B. 96 had not been enacted, Plaintiffs' previously owned funds may anyway belong to the FDIC.

Taken together, Plaintiffs' alleged injury is far too speculative, remote, and abstract to establish standing. They will not experience a harm until at least a decade from now, if ever. And that assumes Plaintiffs sit on their hands and take no action to claim their funds before then, which is entirely within their control. Absent any imminent harm, Plaintiffs cannot maintain this lawsuit.

**D.      PLAINTIFFS' CLAIMS WILL NOT BE RIPE UNTIL 2036 AT THE EARLIEST.**

"[T]he prerequisite of ripeness is a limitation on [the court's] jurisdiction." *State ex rel. Elyria Foundry Co. v. Indus. Comm.*, 82 Ohio St. 3d 88, 89 (1998). "The basic principle of ripeness may be derived from the conclusion that judicial machinery should be conserved for problems which are real or present and imminent, not squandered on problems which are abstract or hypothetical or remote." *State v. Maddox*, 2022-Ohio-764, ¶ 7 (quotations omitted). Even if a plaintiff's injury is sufficiently imminent to satisfy the standing requirement, "the prudential justiciability concerns of ripeness [still] can act to bar consideration of the claim." *Id.* at ¶ 8 (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996)). "The prudential-justiciability concerns include (1) whether the claim is fit for judicial decision and (2) whether withholding court consideration will cause hardship to the parties." *Id.* Although closely related, ripeness and exhaustion of administrative remedies are separate defenses. *See Hamilton v. Ohio Dep't of Health*, 2015-Ohio-4041, ¶ 26 (10th Dist.) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003)) ("Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'").

As relevant here, ripeness is "peculiarly a question of timing." *Elyria Foundry* at 89 (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974)). It is a "limitation on

jurisdiction" that requires courts to avoid "premature adjudication" and "entangling themselves in abstract disagreements over administrative policies." *Id.* (citations omitted). Plaintiffs' claims are not ripe for many of the reasons discussed above. Additionally, exercising jurisdiction here would put valuable court resources to use to adjudicate a remote, hypothetical injury that will occur—if at all—***more than a decade in the future***.

Dismissal will allow Plaintiffs to follow the administrative procedures already available to claim the funds they allegedly own that remain in the UFTF. If they submit valid claims for those funds, they will have no cognizable injury at all. The prudential concerns of justiciability justifies dismissal of Plaintiffs' claims on subject matter jurisdiction grounds.

### E. THE AMENDED STATUTE IS CONSTITUTIONAL BECAUSE PLAINTIFFS RETAIN NO PROPERTY INTEREST IN ABANDONED PROPERTY.

Beyond the defenses that preclude Plaintiffs from even pursuing this lawsuit, their constitutional challenges to the amended statute fail as a matter of law. Plaintiffs' Complaint, clothed in hyperbole and outrage, imagines H.B. 96 as a novel, unconstitutional way for the State to claim Ohioans' personal property. And according to Plaintiffs, the impetus for the Amendment is nothing short of a grand conspiracy. The real explanation is much simpler and far less dramatic. Escheat statutes, like the amended statute here, have been around—and withstood constitutional challenges—for decades. As the Supreme Court recently explained, there is a "long tradition of States taking title to abandoned property." *Tyler v. Hennepin County*, 598 U.S. 631, 646 (2023). The amended statute passes constitutional muster, the State's assumption of title is not a taking, and the escheat process provides claimants with due process. Counts I, II, III, and VIII should be dismissed.

Courts begin statutory analysis with a presumption that legislative enactments are constitutional, and the "party challenging the constitutionality of a statute bears the burden of

proving that it is unconstitutional beyond a reasonable doubt." *State v. Bloomer*, 2009-Ohio-2462, ¶ 41 (citing *State v. Ferguson*, 2008-Ohio-4824, ¶ 12). Accordingly, courts have "a duty to liberally construe statutes 'to save them from constitutional infirmities.'" *Mahoning Educ. Ass'n of Dev. Disabilities v. State Emp. Relations Bd.*, 2013-Ohio-4654, ¶ 13 (quoting *Desenco, Inc. v. Akron*, 84 Ohio St.3d 535, 538 (1999)).

Escheat is a centuries-old concept. Originating in feudal England and incorporated into early American law, it provides that the sovereign takes title to real or personal property in the absence of any owner. Note, *Origins and Development of Modern Escheat*, 61 Colum. L. Rev. 1319, 1326-27 (1961). Originally applied as a principle of intestate succession, the concept expanded to include escheat of abandoned property. *See id.* at 1319-20, 1330. But rather than enacting "true" escheat statutes for personal property, many states elected to enact "custodial" escheat statutes through which the state did not necessarily take title. Under these custodial statutes, the state held the property for the benefit of the owners. *See id.* at 1330.

As states adopted unclaimed property statutes in the wake of the Revolutionary War, some states' "custodial" statutes provided for the state to take custody of the property indefinitely; others provided that, after a period of time, the property would escheat to the state. *Id.* at 1331 ("In some states the owner's claim is barred after the statutory period has expired, and at such time escheat occurs."); Edward Bernert et al., *An Examination of Unclaimed Property Laws After the Adoption of RUUPA: Suggestions for Continued Advancement*, 71 Tax Law. 941, 944 (2018) ("Some states' laws provided for the state to conserve the property for the owner, while using it for the benefit of the state, until a statutory period passed and ownership passed to the state by escheat.").

Escheat statutes have been the subject of constitutional challenges for decades, resulting in voluminous precedent confirming the constitutionality of the amended statute here. Among the

15

litany of authorities on this point, two United States Supreme Court cases warrant discussion. First, in *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 430 (1951), the plaintiff challenged New Jersey's Escheat Act. New Jersey's statute provided that, if property was unclaimed for 14 years, "such personal property shall escheat to the State." *Id.* The plaintiff argued that the escheat of certain shares and unpaid dividends of the company was unconstitutional and violated the Fourteenth Amendment's Due Process Clause. *Id.* at 431-32. The Court upheld the statute. It explained that "a state, subject to constitutional limitations, may use its legislative power to dispose of property within its reach, belonging to unknown persons." *Id.* at 436. Examining the notice provisions of New Jersey's statute—***which required only notice by publication, far less than the notice provisions in the Statute here***—the Court held that the notice given under the statute was sufficient. *Id.* at 443. Critically, the majority rejected the notion that only custodial statutes were proper. *Id.* In short, the Court upheld (1) the State's power to escheat personal property and (2) its power to do so after issuing reasonable notice by publication.

Thirty years later, the U.S. Supreme Court examined the constitutionality of an Indiana law that provided for the lapse of mineral rights after twenty years of nonuse. *Texaco, Inc. v. Short*, 454 U.S. 516, 518-19 (1982). That law extinguished the owners' mineral rights and vested them in the then-current property owner. *Id.* The appellants argued that the law resulted in an unconstitutional taking without due process. *Id.* at 522. The Court disagreed, observing that "the State has the power to condition the permanent retention of [a] property right on the performance of reasonable conditions that indicate a present intention to retain the interest." *Id.* at 526. Examining its prior decisions, the Court concluded that, "[i]n each instance, as a result of the failure of the property owner to perform the statutory condition, an interest in fee was deemed as a matter of law to be abandoned and to lapse." *Id.* at 529. It rejected outright the argument that the

16

lapse of mineral rights was a taking: "this Court **has never required the State to compensate the owner for the consequences of his own neglect**." *Id.* at 530 (emphasis added).

The Court in *Texaco* also examined whether the statute satisfied due process requirements. The Court held that the statute provided reasonable time periods for compliance: "a two-year period was sufficient to allow property owners in the State to familiarize themselves with the terms of the statute and to take any action deemed appropriate to protect existing interests." *Id.* at 532-33. Compared to the ten-year grace period here, the statute at issue in *Texaco* provided for only a two-year grace period before mineral rights would lapse. *Id.* "Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." *Id.* at 532. The Court noted that "persons owning property within a State are charged with the knowledge of relevant statutory provisions affecting the control and disposition of such property." *Id.* Thus, the statute there, as here, was constitutional because (1) the State had the right and authority to dispose of unused property and to require the performance of reasonable conditions to retain property rights and (2) the statute's grace period, standing alone, satisfied due process.[6]

As amended, the Statute here hews closely to statutes that have long been upheld. Property only ends up in the UFTF if it has been unclaimed for at least five years and reported to the Division as such. R.C. 169.02. Before the property even enters the State's custody, the Statute requires that notice be given to the owner. R.C. 169.03. Subsequently, the Division itself issues notice. R.C. 169.06. The Division also provides ongoing notice by maintaining a website where property

---

[6] *See also, e.g.*, *Delaware v. New York*, 507 U.S. 490, 497 (1993) ("States as sovereigns may take custody of **or assume title to** abandoned personal property as *bona vacantia*, a process commonly (though somewhat erroneously) called escheat.") (emphasis added); *Texas Mun. League Intergovernmental Risk Pool v. Texas Workers' Comp. Comm'n*, 74 S.W.3d 377, 382 (Tex. 2002) ("Under absolute-escheat statutes, the state acquires title to property through operation of law or a judicial proceeding…. Escheat statutes, whether absolute or custodial, are constitutional if they give potential claimants notice after the state acquires the funds and an administrative and judicial hearing to adjudicate claims.").

owners can search for their unclaimed funds at any time, free of charge. Property then escheats to the State only after an additional ten years. Even then, claimants still have a grace period until 2036 (more than another 10 years from now) to bring claims and be reimbursed for escheated property. R.C. 169.08(I)(3)(b). In total, even under the amended statute, Plaintiffs would have **up to a quarter century** before funds they previously owned become unrecoverable, and they can still prevent that from happening right now.

And, as relevant here, Plaintiffs had notice far exceeding any minimum constitutional requirement. Plaintiffs admit that they each have **actual notice** of funds in the UFTF, as they allege that "[e]ach Plaintiff has confirmed, via a review of the public database maintained by the Ohio Division of Unclaimed Funds, that the State is currently holding unclaimed property to which they are entitled[.]" Compl. ¶ 8. That admission makes it indisputable that Plaintiffs had adequate notice, and that notice exceeds what was constitutionally required of Defendants as articulated in *Standard Oil* and *Texaco*.

In the face of abundant authority upholding the very framework set forth in the amended statute, Plaintiffs rely on *Sogg v. Zurz*, 2009-Ohio-1526 to claim that "the Ohio Supreme Court stated in 2009, the funds in the [UFTF] 'are not abandoned; they are the property of their owner.'" Compl. ¶ 16. Plaintiffs' reliance on *Sogg* is misplaced; in fact, it provides a roadmap for why the amended statute is constitutionally valid. The Ohio Supreme Court in *Sogg* addressed whether, under the then-existing structure of Chapter 169, the State could retain interest earned on unclaimed funds. *Sogg* at ¶¶ 2-4. The Court held that interest was payable **because** the Statute was not an escheat statute and, therefore, the plaintiffs retained property rights to the interest on their unclaimed funds. *Id.* at ¶ 8. The Court left open the door to a different outcome had the statute been a true escheat statute, as it is now, and nowhere did it say or even suggest that a true escheat

statute would be unconstitutional. *See Arbino v. Johnson & Johnson*, 2007-Ohio-6948, ¶ 23 (quoting *Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 5 (1989) ("[S]tare decisis…is limited to circumstances 'where the facts of a subsequent case are substantially the same as a former case.'")).

Simply put, the way the Statute has been amended precludes Plaintiffs' constitutional claims. When individuals have abandoned their property, "the former owner retains no interest for which he may claim compensation." *Texaco* at 530. In other words, "[i]t is the owner's failure to make any use of the property—and not the action of the State—that causes the lapse of the property right; there is no 'taking' that requires compensation." *Id.* at 517. Further, a State may place reasonable conditions on the ownership of property—here, that would be filing a claim in order to get unclaimed property back. If the owner fails or declines to do so—as Plaintiffs have done here— the State is not required "to compensate the owner for the consequences of his own neglect." *Id.*

As for Plaintiffs' claims brought under Article I, Section 19 of the Ohio Constitution, the analysis is substantially the same as it is under federal law. *See, e.g.*, *State ex rel. New Wen, Inc. v. Marchbanks*, 2020-Ohio-63, ¶¶ 14-16 (analyzing takings claims under United States and Ohio Constitutions together). To the extent the analysis is different, it does not matter here. As discussed, the escheat of property in the UFTF is not a taking at all, making Article I, Section 19 inapplicable.

Finally, in Count VIII, Plaintiffs claim that the amended statute is *ultra vires*, or outside the bounds of the General Assembly's legislative authority. But that argument is based on Plaintiffs' theory that the amended statute is unconstitutional. *See* Compl. ¶ 146 ("Because the legislature enacted R.C. §169.08(I) in contravention of the requirements and restrictions of Ohio's Constitution, any attempt by Respondents to exercise any of the powers granted thereunder would

19

be ultra vires."). Because the State has the power to escheat property and acted within its constitutional boundaries in enacting the amended statute, Count VIII also fails.

The amended statute is constitutional, and statutes like it have been upheld for decades. In light of the Court's obligation to liberally construe statutes to avoid constitutional infirmities, Plaintiffs' constitutional claims ring especially hollow. Accordingly, Counts I, II, III, and VIII should be dismissed for failure to state a claim.

### F. PLAINTIFFS ARE NOT ENTITLED TO EQUITABLE RELIEF BECAUSE THEY HAVE AN ADEQUATE REMEDY AT LAW.

Plaintiffs seek various forms of equitable relief, including for injunctions and mandamus. They are not permitted equitable relief where they have an adequate remedy at law, which includes administrative remedies.

Injunctive relief is proper only when there is no adequate remedy at law. *Fodor v. First Nat'l Supermarkets, Inc.*, 63 Ohio St.3d 489, 491 (1992) (citing *Garono v. State*, 37 Ohio St.3d 171 (1988)). "[T]he existence of a remedy at law…exclude[s] the option of injunctive relief." *Id.*

The same limitation applies to claims for mandamus relief. A writ of mandamus is an extraordinary remedy issued "in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station." R.C. 2731.01; *see also State ex rel. United Automobile, Aerospace & Agricultural Implement Workers of America v. Ohio Bureau of Workers' Compensation*, 2006-Ohio-1327, ¶ 34. But a "***writ of mandamus must not be issued when there is a plain and adequate remedy in the ordinary course of the law***." R.C. 2731.05 (emphasis added). The existence of an administrative remedy constitutes an adequate remedy at law, and "it is well settled that the failure to pursue an adequate administrative remedy bars mandamus relief." *Ohio Academy of Nursing Homes, Inc. v. Ohio Dep't of Jobs & Fam. Servs*., 2021-Ohio-1414, ¶

20

19 (10th Dist.) (quoting *State ex rel. Borchert v. Greenbriar Health Care Ctr.*, 2007-Ohio-940, ¶ 35 (10th Dist.)).

As discussed in Section III.B, above, Plaintiffs have failed to exhaust their administrative remedies. Accordingly, in addition to all the other reasons why the Complaint should be dismissed, Plaintiffs' equitable claims cannot survive.

### G. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY.

In Count IV, Plaintiffs advance the theory that the State owes them a fiduciary duty under Chapter 169. Compl. ¶¶ 111-14. Plaintiffs appear to contend that the State will breach that duty by following the provisions of the amended statute. *Id.* Of course, that claim requires the Court to conclude that the General Assembly ***intended*** the Amendment to be rendered meaningless because it would result in the Defendants being unable to comply with the amended statute as enacted. Such a position is circular and untenable. *See Summerville v. Forest Park*, 2010-Ohio-6280, ¶ 19 ("The primary rule in statutory construction is to give effect to the legislature's intention.").

Regardless, the State owes no duty—fiduciary or otherwise—to Plaintiffs over their previously owned but since abandoned property. When property is abandoned, "the former owner retains no interest for which he may claim compensation." *Texaco* at 530. While the Division holds property in trust for the benefit of individuals with an interest in that property, it has no obligation to individuals whose property rights are extinguished by virtue of their own neglect. That is at the very heart of the Amendment.

### H. H.B. 96 DOES NOT VIOLATE THE SINGLE-SUBJECT RULE.

In Count V of the Complaint, Plaintiffs allege that H.B. 96 violates the Ohio Constitution's single-subject rule. That Count is nothing more than a less-than-subtle diatribe on whether the Amendment makes for good public policy. The Court should decline to entertain Plaintiffs' efforts to substitute their policy judgments for those of the democratically elected representatives of the

21

People of the State of Ohio. Plaintiffs' policy views aside, the Ohio Supreme Court has routinely rejected single-subject attacks on appropriations bills. Here, because the challenged provisions either relate to the raising of revenue or the expenditure of funds on projects, they fall within the single subject of H.B. 96.

Article II, Section 15(D) of the Ohio Constitution contains the one-subject rule: "No bill shall contain more than one subject, which shall be clearly expressed in its title." The purpose of the rule "is to prevent logrolling, which occurs when legislators combine disharmonious proposals in a single bill to ensure passage of proposals that might not have won acceptance on their own." *State ex rel. Ohio Civ. Serv. Emps. Ass'n v. State*, 2016-Ohio-478, ¶ 15 (citing *State ex rel. Dix v. Celeste*, 11 Ohio St.3d 141, 142-43 (1984)). The courts' role in enforcement of the one-subject rule is "limited." *Id.* at ¶ 16. "To accord appropriate deference to the General Assembly's law-making function, we must liberally construe the term 'subject' for purposes of the rule." *Id.* (citing *Sheward*, 86 Ohio St.3d at 498).

The Ohio Supreme Court has long recognized the need for deference to the General Assembly and the "rational and practical reasons for the combination of topics on certain subjects":

> The one-subject rule does not prohibit a plurality of topics, only a disunity of subjects. *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections,* 62 Ohio St.3d 145, 148, 580 N.E.2d 767 (1991). The **mere fact that a bill embraces more than one topic is not fatal as long as a common purpose or relationship exists between the topics**. *Hoover v. Franklin Cty. Bd. of Commrs.*, 19 Ohio St.3d 1, 6, 482 N.E.2d 575 (1985). And we invalidate statutes as violating the one-subject rule only when they contain "**a manifestly gross and fraudulent violation**." *Dix* at 145, 464 N.E.2d 153. That standard recognizes not only the General Assembly's great latitude in enacting comprehensive legislation, but also that ["]there are rational and practical reasons for the combination of topics on certain subjects*. **It acknowledges that the combination of provisions on a large number of topics, as long as they are germane to a single subject, may not be for purposes of logrolling but for the purposes of bringing greater order and cohesion to the law** or of coordinating an improvement of the law's substance.["] *Id.* Only when there is no practical, rational or legitimate reason for combining provisions in one act will we find a one-subject-rule violation. *Id.*

*Ohio Civ. Serv.* at ¶ 17 (emphases added).

Appropriations bills like H.B. 96 can present challenges in applying the one-subject rule, because they "necessarily address wide-ranging topics and bring unique challenges for judicial review." *Id.* at ¶ 18. Nonetheless, the purpose of an appropriations bill is easily ascertained: "balancing state expenditures against state revenues to ensure continued operation of state programs." *Id.* at ¶ 23. Thus, the Ohio Supreme Court has rejected one-subject challenges to appropriations bills where the provisions "relate[] to funding the operations of programs, agencies, and matters described elsewhere in the bill." *Id.* (quoting *ComTech Sys., Inc. v. Limbach,* 59 Ohio St.3d 96, 99 (1991)).

The challenged provisions of H.B. 96 are rationally related "to the overall subject of state expenditures and revenues." *Id.* at ¶ 26. The Bill appropriates $1 billion "for deposit into the Ohio Cultural and Sports Facility Performance Grant Fund," a portion of which to be used to support construction of a transformational major sports facility mixed-use project. H.B. 96 Section 229.40. The source of the appropriation is revenue from the amended Unclaimed Funds Statute—specifically, the provisions of R.C. 169.08 that provide for unclaimed funds to escheat. *Id.*

These two complained-of provisions fall squarely within the single subject of H.B. 96. One is an appropriation; the other provides the revenue for that appropriation. Together, they fall within the overall subject of state expenditures and revenues. Plaintiffs' single-subject challenge fails. *See Ohio Civil Services* at ¶¶ 33-34. Count V should be dismissed.

I.     **PLAINTIFFS HAVE FAILED TO STATE VIABLE CLAIMS AGAINST DEFENDANTS BLEDSOE AND SPRAGUE.**

The amended statute charges various officials with duties related to the escheat and subsequent appropriation of funds. R.C. 169.08; H.B. 96 Section 229.40. The Executive Director of the Ohio Facilities Construction Commission and the Ohio Treasurer are not among them.

### 1.   DEFENDANT BLEDSOE IS AN IMPROPER DEFENDANT.

The Complaint alleges that "Joy Bledsoe, acting in her capacity as the Executive Director for the Executive Director [sic] of the Ohio Facilities Construction Commission is charged with the responsibility of utilizing the confiscated funds…for the newly created 'Cultural, Sports, and Major Sports Facilities Grant Fund [sic].'" Compl. ¶ 57. In fact, H.B. 96 says nothing of the sort, nor does it charge the Ohio Facilities Construction Commission's Executive Director (or any other of its personnel) with utilizing escheated funds. *See* R.C. 123.282 (as enacted by H.B. 96) and H.B. 96 Section 229.40. Defendant Bledsoe's role does not involve administering, awarding, or utilizing any of the alleged funds. *See* R.C. 123.281(H) (as amended by H.B. 96).

Apparently relying on prior iterations of the Bill and failing to read the final, enacted language under which the Executive Director of the Ohio Facilities Construction Commission plays no role in the administration of the UFTF or the Ohio Cultural and Sports Facility Performance Grant Fund or the respective appropriation from that fund, Plaintiffs misread H.B. 96. *See* H.B. 96 enactment of R.C. 123.282, amendment to R.C. 169.08, and Section 229.40. Plaintiffs' claims against Defendant Bledsoe should be dismissed.

### 2.   DEFENDANT SPRAGUE IS AN IMPROPER DEFENDANT.

Under H.B. 96, the Treasurer's role in the UFTF will be ministerial. At no time, will the Treasurer enjoy any authority to move money from the UFTF into the state treasury. Nor will the Treasurer enjoy any authority to disburse funds from the UFTF on behalf of the Department of Commerce. The Treasurer does not currently have the ability to move money into or disburse money from Department of Commerce accounts, and that will not change even after H.B. 96 goes into effect.

Thus, nothing about H.B. 96 creates an actionable claim against the Treasurer, and he is entitled to a dismissal from this lawsuit. *See generally Sogg*, 2009-Ohio-1526 (considering

challenge to prior statute involving UFTF where Director of Commerce—but not Treasurer—was named as defendant); *see also The R. Wantz & Sons Constr. Co. v. Donahey*, 1974 WL 184119, *3 (10th Dist. May 7, 1974). In *Wantz*, the plaintiff filed an appeal of the trial court's order dismissing the Ohio Treasurer "as not being a proper party defendant" in the lawsuit. *See id.* at *1. The Tenth District affirmed, explaining as follows:

> As the judgment entry would relate to the defendant [Ohio Treasurer], we are in agreement with the trial court and hereby affirm the trial court's dismissal of this defendant. The treasurer of state, by law, may pay a refund where independent determination has been made as to any tax assessment or payment which was illegal or erroneous as to such taxpayer, which amount of refund or repayment may have been certified to the treasurer of state. Here, of course, there has been no such certification to the treasurer of state. We therefore hold, as to this defendant, that the trial court properly, upon motion, dismissed [the Treasurer from]…this matter.

*Id.* at *3.

As in *Wantz*, Plaintiffs have not identified any action taken, or to be taken, by the Treasurer that gives rise to a viable claim. The Treasurer is entitled to dismissal from this lawsuit.

## IV. CONCLUSION

Plaintiffs' Complaint is procedurally and substantively deficient. Plaintiffs have failed to exhaust the administrative remedies available to them, lack standing, and present claims that are not ripe for judicial review. Even if they could overcome those threshold issues, the Complaint fails to state any claim upon which relief can be granted. The challenged statute is constitutional, Plaintiffs have an adequate remedy at law, and their remaining claims are unsupported by the facts or the law. For these reasons, Defendants respectfully ask the Court to dismiss the Complaint in its entirety and with prejudice under Civ.R. 12(B)(1) and Civ.R. 12(B)(6).

Respectfully submitted,

*/s/ Aneca E. Lasley*
Aneca E. Lasley (0072366) (Trial Attorney)
Andrea E. Howell (0101138)
ICE MILLER LLP
250 West Street, Suite 700
Columbus, Ohio 43215
Tel:  (614) 462-2700/Fax:  (614) 462-5135
Aneca.Lasley@icemiller.com
Andrea.Howell@icemiller.com

Joshua Klarfeld (0079833)
ICE MILLER LLP
600 Superior Ave East, Suite 1300
Cleveland, OH 44114
Tel:  (216) 394-5063
Joshua.Klarfeld@icemiller.com

John D. French (#37629-53)
*(Pro Hac Vice pending)*
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282
Tel:  (317) 236-2100/Fax:  (317)-236-2219
JD.French@icemiller.com

*Special Counsel for Defendants Sheryl
Maxfield (in her official capacity as Director
of the Ohio Department of Commerce), Akil
Hardy (in his official capacity as
Superintendent of the Ohio Division of
Unclaimed Funds), Robert Sprague (in his
official capacity as Ohio Treasurer), and Joy
Bledsoe (in her official capacity as Executive
Director of the Ohio Facilities Construction
Commission)*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing was served via the Court's e-filing system on this 3rd day of September, 2025 upon all counsel of record.

*/s/ Aneca E. Lasley*

Aneca E. Lasley (0072366)
